# United States Court of Appeals
## For the First Circuit

Volume I of II

No. 01-1647

UNITED STATES OF AMERICA,

Appellee,

v.

José Rodriguez-Marrero,

Defendant, Appellant.

No. 02-1462

UNITED STATES OF AMERICA,

Appellee,

v.

Omar F. Genao-Sanchez,

Defendant, Appellant.

No. 02-1707

UNITED STATES OF AMERICA,

Appellee,

v.

Luis Roldan-Cortes,

Defendant, Appellant.

APPEALS FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

[Hon. José A. Fusté, U.S. District Judge]

---

Before

Selya, <u>Circuit Judge</u>,
Coffin, <u>Senior Circuit Judge</u>,
and Lipez, <u>Circuit Judge</u>.

---

<u>Lydia Lizarribar-Masini</u> for appellant Omar Genao-Sanchez.
<u>Raymond L. Sanchez Maceira</u> on brief for appellant José Rodriguez-Marrero.
<u>Linda George</u> for appellant Luis Roldan-Cortes.
<u>Thomas F. Klumper</u>, Assistant United States Attorney, with whom <u>H.S. Garcia</u>, United States Attorney, and <u>Sonia I. Torres</u>, Assistant United States Attorney, were on brief for appellee.

---

November 5, 2004

---

**LIPEZ, Circuit Judge**.  The three defendants in this drug conspiracy case played key roles in a smuggling ring that imported large amounts of cocaine and marijuana into Puerto Rico between 1992 and 1996.  After a trial that spanned nearly four weeks and involved more than forty witnesses for the government, a jury found each defendant guilty of a series of crimes, including the drug conspiracy and aiding and abetting murder.  The district court sentenced each defendant to multiple life sentences.

The defendants raise a number of challenges to their convictions.  In the end, we find that one challenge is meritorious -- the argument of Omar Genao-Sanchez that the district court erred in admitting testimonial hearsay against him in violation of the recent Supreme Court decision in Crawford v. Washington, 124 S. Ct. 1354 (2004), a case decided after the completion of this trial.  Although we affirm Genao-Sanchez's drug conspiracy conviction, we conclude that the erroneous admission of the hearsay testimony was not harmless with respect to his convictions for conspiracy to commit murder and for aiding and abetting murder.  Accordingly, we vacate those convictions.  We affirm the convictions and sentences of the other defendants.

## I.

We present facts here in the light most favorable to the verdict to convey the background of the case.  See United States v. Reeder, 170 F.3d 93, 97 (1st Cir. 1999).  We will provide

-3-

additional facts where they are pertinent to the legal analysis of specific issues.

## A. The Conspiracy

As noted, the defendants were members of a drug conspiracy that smuggled large amounts of cocaine and marijuana from South America into southwestern Puerto Rico for itself and other organizations. The drugs were dropped from airplanes at sea and retrieved by the defendants or transferred directly by boat from the defendants' foreign suppliers. The conspirators used a broad array of radios, global positioning system (GPS) receivers, night vision glasses, police scanners, modified cellphones and powerful speedboats to protect their shipments. They also stationed lookouts at various points on the water and near an airport used by the United States Customs Service to protect the loads from raids by law enforcement and rival drug gangs.

After the defendants brought the drugs on shore, the drugs were shipped by truck either to a secure storage location (frequently one of the conspirators' farms) or directly to the individual or organization who had hired the defendants. The individual conspirators received cash or a portion of the drug shipment as payment for their participation, and they distributed the drugs they received to local dealers at drug points throughout the area.

**B. The Co-Conspirators**

Raul Santodomingo-Romero ("Santodomingo") led the drug organization until he was arrested on money laundering charges in 1994; his second-in-command, Victor M. Valle-Lassalle, a/k/a "Manolo" ("Valle-Lassalle"), then took over.[1] Defendant-appellant Luis Roldan-Cortes, a/k/a "Wisi" ("Roldan"), was Valle-Lassalle's right hand man and the godfather to his daughter. The two owned a drug distribution point, giving them the exclusive right to distribute drugs in the Ducos housing project in Aguadilla. Although Valle-Lassalle eventually ended this partnership because he thought that Roldan was unfairly excluding him from some of the side deals that Roldan was arranging, they continued to cooperate together in their smuggling venture. Roldan negotiated at least one drug shipment in the Dominican Republic and participated in the execution of a number of others. His specific responsibilities included loading and unloading and captaining the drug boats, coordinating "security" for the shipments, and inventorying and selling drugs to small distributors. He also helped to arrange the murder of a government informant, James Martin-Rodriguez, a/k/a "Kiri" ("Martin"), who was a member of the conspiracy until he began cooperating with federal investigators.

---

[1]We have included a roster of individuals important for an understanding of this case in the Appendix to this opinion. We refer to the individuals in this case according to the naming scheme that was adopted by the government in its brief.

Defendant-appellant Omar Genao-Sanchez, a/k/a "Omi" ("Genao"), was a drug courier for one of the conspirators, David Rafael Ramos-Rivera, a/k/a "Pecas" ("Ramos"), when he (Genao) was sixteen years old. He later became a member of the conspiracy himself after meeting the other members at Santodomingo's farm. Genao attended meetings at which Valle-Lassalle negotiated drug shipments, helped to bring loads to shore, and, according to the government, participated in the murder of Carlos Roberto Rodriguez Torres, a/k/a "Robert Caballo" ("Caballo"). Although Caballo was an active member of the conspiracy, having participated in smuggling operations, Valle-Lassalle decided to kill him when Caballo threatened to tell members of a Colombian drug cartel that Valle-Lassalle had stolen cocaine from them.

José Rodriguez-Marrero, a/k/a "Zurdo" ("Rodriguez"), the last of the three appellants, joined the conspiracy when Valle-Lassalle offered to let him participate in some drug shipments if he helped to murder Edward Llaurador Rodriguez ("Llaurador"), another co-conspirator turned government informant. Although the government did not introduce evidence that Rodriguez participated in any shipments, its witnesses testified that Rodriguez was present when Valle-Lassalle negotiated shipments and that he would have participated in two shipments if the police had not forestalled them. The first of these shipments was supposed to be a two thousand pound load of cocaine that Valle-Lassalle negotiated

in May 1997 with another smuggler, Angela Ayala. This shipment was canceled when Ayala was arrested. The second involved six hundred kilograms of cocaine that were supposed to have been smuggled on behalf of another smuggler, Henry Pamias, a/k/a "Macho from Cataño" ("Pamias"). That shipment was canceled because Valle-Lassalle was arrested on weapons charges.

Javier E. Soto-Alarcon, a/k/a "Chester" ("Soto"), was a mid-level leader in the conspiracy who joined the drug gang after he started dating Valle-Lassalle's sister. Soto participated in a number of drug loads and in Llaurador's murder. After Soto's wife (he had since ended his relationship with Valle-Lassalle's sister) was shot in a drug-related attack, Soto decided to turn himself in to the authorities. He agreed to cooperate with the government, allowing it to record his conversations, helping government agents to infiltrate the organization, and testifying against the others at trial.

Ramos was a member of the conspiracy before he was arrested and decided to become a government informant. He helped to smuggle a number of large loads of marijuana and cocaine and sold some of the cocaine at a drug point in the Montana housing project in Aguadilla. He also participated in Martin's murder.

Other members of the drug conspiracy included José Hernandez-Jimenez, a/k/a "Chelo" ("Hernandez"), who was murdered by a rival drug gang, and Nicholas Peña Gonzalez ("Peña") and Anibal

Pagan-Cerezo, a/k/a "El Cojo" ("Pagan"), who were indicted along with the defendants here and pled guilty.

## C. Murders Undertaken in Furtherance of the Conspiracy

The drug gang protected its distribution empire with force, killing or seriously wounding suspected informants and rival gang members. Three of those murders played important roles in the conspiracy trial because they were charged as substantive crimes and as overt acts in furtherance of the drug conspiracy.

### 1. Martin's Murder

On November 16, 1992, Martin was arrested with fifteen bales of cocaine belonging to the drug ring. This was the second time that he was arrested for a drug crime, and he agreed to cooperate with the United States Customs Service. Suspecting that Martin had become an informant, Santodomingo and Valle-Lassalle decided to have him murdered in a parking lot at the Ducos housing project. On May 20, 1993, after receiving a phone call from Roldan alerting him to Martin's arrival at the scene, Santodomingo dropped Ramos off at the housing project, where Ramos joined Roldan and Pagan. Roldan identified Martin as the intended murder victim, and told Ramos and Pagan that Martin was at the housing project that day because he was expecting to pick up some money owed to him for drugs. Martin approached the group, and Ramos and Pagan walked off to a corner of the parking lot. After speaking with Roldan for a short while, Martin walked back to his automobile. As he was about

to put the keys in the door, Pagan walked up and shot him three times.  Ramos then joined the attack, and the two shot Martin until Pagan ran out of bullets.  The coroner's report stated that Martin had seventeen bullet wounds in his body.

## 2.  Caballo's Murder

In February, 1996, five members of the drug organization stole approximately thirty kilograms of cocaine that they were smuggling into Puerto Rico on behalf of a Colombian drug operation.  Believing that Caballo had threatened to inform the Colombians about the theft, Valle-Lassalle arranged to have him killed.  According to the government, Genao and another member of the drug ring, Nicholas Peña Gonzalez, picked Caballo up at his house on July 15, 1996, with help from Llaurador.  Peña shot Caballo in a remote area near Yauco, Puerto Rico.  The group then threw Caballo's body in the back of his truck.  They planned to drive the truck to Valle-Lassalle's farm to dismember and dispose of the body (and to disassemble the truck) when the truck became stuck in a muddy ditch and they were forced to abandon it on the side of the road.  As they were abandoning the truck, Caballo tried to get up and asked Peña why he shot him.  Peña answered, "Because you're a mother fucker," and shot him two more times.  The police found the truck and Caballo's body the next morning.

### 3.  Llaurador's Murder

Later that month, Llaurador told local authorities in Ponce about Caballo's murder, and provided sworn statements to the prosecutor regarding the murder on July 31 and September 13 of that year (1996).  He also became a confidential informant for the federal Drug Enforcement Administration ("DEA") on September 3, 1996.  The local police arrested Genao and Valle-Lassalle for Caballo's murder based on Llaurador's statements.  They issued a warrant for Peña's arrest, but he fled before they could apprehend him.  The criminal complaint, which was given to both Genao and Valle-Lassalle when they were arrested, identified Llaurador as an informant.

Valle-Lassalle was released on bail subsequent to his arrest.  Having seen Llaurador's name on the criminal complaint, Valle-Lassalle knew that Llaurador had "snitched" to the police about Caballo's murder.  Telling Soto that Llaurador would likely "snitch" on all of them, he recruited Soto, Rodriguez, and two other members of the conspiracy to find Llaurador and murder him. The men found him on October 13, 1996 and bound him with wire. Rodriguez proceeded to behead Llaurador with a machete while he was still alive.  They dismembered his body, placed the various parts in plastic garbage bags, and threw the bags over a cliff at an abandoned dump site.  Valle-Lassalle watched the murder and told

his co-conspirators that if they told anyone about it, they would meet the same fate. He promised to repay Rodriguez for murdering Llaurador by allowing him to participate in one of the upcoming smuggling operations.

## D. Arrests and District Court Proceedings

On December 17, 1997, the government unsealed a two count indictment against Genao, Rodriguez, Valle-Lassalle, Peña, and four others. Roldan was not charged in that initial indictment. The government obtained a twelve count second superseding indictment on July 6, 2000 against Genao, Rodriguez, Valle-Lassalle, Peña, Roldan, Pagan, and six others.[2] The twelve defendants were charged with: (1) conspiracy to possess with the intent to distribute more than five kilograms of cocaine and multi-hundred pound quantities of marijuana; (2) conspiracy to commit firearms murder in relation to a drug trafficking offense (Caballo); (3) aiding and abetting firearms murder in relation to a drug trafficking offense (Caballo); (4) aiding and abetting the murder of a witness or informant (Llaurador); (5) aiding and abetting murder while

_____

[2]The government had previously obtained a six count first superseding indictment on July 15, 1998, charging Valle-Lassalle, Rodriguez, Peña, Genao, Pamias, Santodomingo, and four others with conspiracy to possess with intent to distribute more than five kilograms of cocaine and multi-hundred pound quantities of marijuana; conspiracy to commit firearms murder in relation to a drug trafficking offense (Caballo); firearms murder in relation to a drug trafficking offense (Caballo); murder of a witness or informant (Llaurador); murder while engaging in a drug trafficking offense (Llaurador); and witness tampering.

-11-

engaging in a drug trafficking offense (Llaurador); (6) witness tampering (Soto); (7) aiding and abetting firearms murder in relation to a drug trafficking offense (Martin); (8) aiding and abetting the murder of a witness or informant (Martin); (9) aiding and abetting murder while engaging in a drug trafficking offense (Martin); (10) aiding and abetting solicitation of a crime of violence; (11) misprision of felony; and (12) possession with intent to distribute in excess of five kilograms of cocaine. The appellants here were charged as follows:

| Count | Summary | Appellant(s) |
|-------|---------|--------------|
| 1 | The drug conspiracy | Genao, Rodriguez, and Roldan |
| 2 | Conspiracy to commit firearms murder in furtherance of a drug crime (Caballo) | Genao |
| 3 | Aiding and abetting firearms murder in furtherance of a drug crime (Caballo) | Genao |
| 4 | Aiding and abetting murder of a witness (Llaurador) | Rodriguez |
| 5 | Aiding and abetting murder in furtherance of a drug crime (Llaurador) | Rodriguez |
| 7 | Aiding and abetting firearms murder in furtherance of a drug crime (Martin) | Roldan |
| 8 | Aiding and abetting murder of a witness (Martin) | Roldan |
| 9 | Aiding and abetting murder while engaging in a drug crime (Martin) | Roldan |

After having been arraigned on the first indictment on December 22, 1997, Rodriguez was arraigned on the second superseding indictment on July 18, 2000. Similarly, Genao was arraigned on the first superseding indictment on December 27, 1999 and the second on July 20, 2000. Roldan was only indicted once, on July 18, 2000. The government certified the defendants as being eligible for the death penalty shortly after their arraignment and maintained that position until the day before the trial was scheduled to begin.

**E.  The Trial**

Of the twelve indicted defendants, only the three appellants here pled not guilty and proceeded to trial. The trial began on September 7, 2000. Roldan's and Genao's attorneys repeatedly informed the court on the first day of trial that they were unprepared to try the case, and both requested continuances. The court denied their motions.

The government presented testimony from more than forty witnesses, including Commonwealth investigators, police officers, federal agents, eyewitnesses, and technical experts. The core of its case was built by two co-conspirators and cooperating witnesses, Soto and Ramos, each of whom testified for the greater part of a week. Soto began his testimony with a detailed first-hand account of Llaurador's murder, highlighting Rodriguez's participation in the killing and Valle-Lassalle's promise to reward

-13-

Rodriguez for his participation. Soto then recounted how he joined the conspiracy and the manner in which he met each of the co-conspirators. The first time that he visited a farm owned by Valle-Lassalle, he helped to inventory six to seven thousand pounds of marijuana. He also described the planning and execution of the organization's narcotics shipments and the roles played by Genao, Rodriguez, and Roldan. He provided the details regarding a seven hundred kilogram load of cocaine that the group smuggled in May or June 1994, and discussed a trip that he took to Ayala's house in the summer of 1997 with Valle-Lassalle, Rodriguez, and Hernandez to negotiate a shipment of two thousand kilograms of cocaine. Valle-Lassalle negotiated with Ayala while Rodriguez and Hernandez listened to music and played pool. Ayala was arrested before that shipment could take place, but Valle-Lassalle negotiated another shipment later that summer. The second shipment was interrupted when Valle-Lassalle was arrested on Commonwealth weapons charges stemming from a shootout that he had with members of a rival drug gang. Soto also briefly recounted Valle-Lassalle's explanation of Caballo's murder. Finally, he described how he became a government informant and the terms of his plea agreement.

Ramos began his testimony by providing a first-person account of Martin's murder. He then named some of the key members of the conspiracy, explained how he knew them, and described their roles in the organization. He provided details on a number of the

cocaine and marijuana shipments that he helped to smuggle. These included a six to seven thousand pound shipment of marijuana in the summer of 1993, which Roldan helped to inventory; six hundred kilogram shipments in late December 1993 and late December 1994, which Roldan helped to transport; a nine hundred to one thousand kilogram shipment in the fall of 1995 on behalf of Ayala, which Genao helped to transport; and a shipment of cocaine in February 1996, which Genao also helped to transport. Caballo later learned that Valle-Lassalle had stolen thirty kilograms of cocaine from this shipment. Ramos described his unsuccessful efforts to prevent Valle-Lassalle from killing Caballo to cover up that theft and essentially repeated Genao's description of Caballo's murder. He noted that after Genao was arrested for Caballo's murder, Genao wrote to him requesting a loan for bail money. Ramos forwarded that request to Valle-Lassalle who instructed Ramos to tell Genao not to worry because he would be out soon. Nine days later, Llaurador -- the chief witness against Genao in the murder case -- was killed, and Genao was released for lack of evidence. Valle-Lassalle told Ramos that "he had taken care of the problem because the guy who was snitching had been killed."

Ramos also testified about the methods of drug distribution that he employed. He managed the drug point in the Montana housing project and sold the drugs that he bought or received as payment from Valle-Lassalle. He said that he

frequently used Genao as a courier to pick up drugs for Ramos to sell. Finally, Ramos testified that he was arrested for attempting to introduce drugs into the country on August 24, 1998. He pled guilty and began cooperating in approximately April 1999.

On October 10, 2000, the jury convicted the three defendants on all counts. On March 28, 2001, the district court sentenced Rodriguez to two life sentences for his two murder convictions, aiding and abetting murder of a witness (Llaurador) and aiding and abetting murder in furtherance of a drug crime (Llaurador). See U.S.S.G. § 2A1.1, cmt. 1 ("The Commission has concluded that in the absence of capital punishment, life imprisonment is the appropriate punishment for premeditated killing."). The court applied the murder cross reference to his drug conspiracy conviction to sentence him to life in prison on that conviction as well. See U.S.S.G. § 2D1.1(d)(1) (instructing courts to apply the first degree murder sentencing guideline when considering the appropriate sentencing range for a drug conviction if a victim was killed under circumstances that would constitute murder under 18 U.S.C. § 1111); see United States v. Reyes-Echevarria, 345 F.3d 1, 6 (1st Cir. 2003) (upholding the sentencing court's application of the murder cross reference to the defendant's drug conspiracy conviction after the sentencing judge concluded by a preponderance of the evidence that the defendant had murdered a rival drug dealer).

-16-

On March 18, 2002, the court sentenced Genao to two life sentences for his two murder convictions, conspiracy to commit firearms murder in furtherance of a drug crime (Caballo) and aiding and abetting firearms murder in furtherance of a drug crime (Caballo), and applied the murder cross reference to his drug conspiracy conviction, sentencing him to a total of three life sentences. On the same day, the court sentenced Roldan to three life sentences for his three murder convictions, aiding and abetting firearms murder in furtherance of a drug crime (Martin), aiding and abetting murder of a witness (Martin), and aiding and abetting murder while engaging in a drug crime (Martin). It also applied the murder cross reference to Roldan's drug conspiracy conviction, resulting in a total of four life sentences. Genao and Roldan filed multiple motions for new trials based on newly-discovered evidence, which the district court denied.

## II.

**A.  Rodriguez's Claims**

**1.  Specificity of the Indictment**

Arguing that count four of the second superseding indictment (murder of a witness) did not provide sufficient details regarding the federal nexus of Llaurador's murder, Rodriguez argues that his conviction should be vacated. The Federal Rules of Criminal Procedure generally require defendants to raise objections to indictments prior to trial. See Fed. R. Crim. P. 12(b)(3)(B)

-17-

(stating that "a motion alleging a defect in the indictment or information" "must be raised before trial").  Failure to do so constitutes waiver.  See  Fed. R. Crim. P. 12(e) ("A party waives any Rule 12(b)(3) defense, objection, or request not raised by the deadline the court sets under Rule 12(c) or by any extension the court provides.").  Although Rule 12 creates exceptions for objections challenging a court's jurisdiction and those claiming that the indictment did not actually charge the crime for which the defendant was tried, Rodriguez's objection to the specificity of count four does not fall under these exceptions.  See United States v. Crowley, 318 F.3d 401, 420 (2d Cir. 2003).  In the absence of any indication in the record that Rodriguez objected to the specificity of the indictment before trial, we conclude that he waived this argument.[3]

## 2.  Sufficiency of the Evidence

Rodriguez argues that the government failed to introduce sufficient evidence to support two counts of his conviction, the drug conspiracy charge (count one) and the aiding and abetting murder of a witness charge (count four).[4]  We review a sufficiency of the evidence claim de novo, "eschewing credibility judgments and

---

[3]While Rule 12(e) allows a reviewing court to grant relief from this waiver for good cause, we see no basis for doing so here.

[4]Rodriguez did not challenge the sufficiency of the evidence regarding his conviction on count five, aiding and abetting the murder (of Llaurador) in furtherance of a drug crime.

drawing all reasonable inferences in favor of the verdict, to ascertain if a rational jury could have found that the government proved each element of the crime beyond a reasonable doubt." United States v. Sepulveda, 15 F.3d 1161, 1173 (1st Cir. 1993) (citations omitted).

### a. Conspiracy

"To prove the elements of the crime of conspiracy, the Government must show the existence of a conspiracy, the defendant's knowledge of the conspiracy, and the defendant's voluntary participation in the conspiracy." United States v. Llinas, 373 F.3d 26, 30 (1st Cir. 2004) (internal quotation marks omitted). Proof of the defendant's participation in the conspiracy must include proof that he intended to commit the underlying substantive offense. Sepulveda, 15 F.3d at 1173. "Such proof may consist of circumstantial evidence, including inferences from surrounding circumstances, such as acts committed by the defendant that furthered the conspiracy's purposes. The government need not prove that a co-conspirator knew all of the details or participated in all of the objectives of the plan." Llinas, 373 F.3d at 30 (internal quotation marks omitted). Since Rodriguez does not contest the existence of a drug conspiracy, we need only consider whether the government proved his participation in the conspiracy.

Rodriguez claims that the only evidence linking him to the drug conspiracy was Soto's testimony that Rodriguez was present

-19-

at the May 1997 meeting with Angela Ayala, when she and Valle-Lassalle negotiated the details of a two thousand kilogram cocaine shipment. He argues that while he was at her house during the meeting, he played pool, listened to music, and did not participate in that meeting.

This argument reflects a highly misleading view of the evidence adduced at trial. In fact, Soto testified that Valle-Lassalle offered to allow Rodriguez to participate in this particular drug smuggling operation if he murdered Llaurador. Prior to the meeting, Soto told Rodriguez that Rodriguez's share of that drug shipment could be twenty to thirty thousand dollars, and Rodriguez remarked that he expected to receive "a good position" in the drug organization for committing the murder. His claim that he was innocently playing pool at Ayala's house without knowledge that a major narcotics deal was being negotiated simply does not withstand scrutiny. Given this testimony, we have no difficulty concluding that a jury could have found beyond a reasonable doubt that Rodriguez was part of the drug conspiracy.

**b. Aiding and Abetting Murder of a Witness**

Rodriguez also claims that the evidence that the government introduced to prove that he murdered Llaurador was insufficient to establish a violation of the Witness Protection Act, which states:

> [W]hoever kills . . . another person, with
> intent to (A) prevent the attendance or

-20-

testimony of any person in an official proceeding [or] . . . (C) prevent the communication by any person to a law enforcement officer or judge of the United States of information relating to the commission or possible commission of a Federal offense . . . shall be punished . . . .

18 U.S.C. § 1512(a)(1). The government argues that Rodriguez killed Llaurador to prevent him from communicating with authorities regarding federal offenses.

To establish a crime under the "law enforcement officer" section of the Act, the government must prove that:

(1) the defendant killed or attempted to kill a person; (2) the defendant was motivated by a desire to prevent the communication between any person and law enforcement authorities concerning the commission or possible commission of an offense; (3) that offense was actually a federal offense; and (4) the defendant believed that the person in (2) above might communicate with the federal authorities.

United States v. Stansfield, 101 F.3d 909, 918 (3d Cir. 1996). The Act explicitly relieves the government from having to prove that the defendant suspected that the witness would communicate to federal, as opposed to state, officials regarding the crime, see 18 U.S.C. § 1512(g) (stating that "[i]n a prosecution for an offense under this section, no state of mind need be proved with respect to the circumstance . . . that the law enforcement officer is an officer or employee of the Federal Government"); therefore, the fourth prong may be proven, among other ways, by demonstrating that the underlying offense was a federal offense and that the federal

-21-

authorities had begun an investigation prior to the informant's murder or attempted murder. United States v. Bell, 113 F.3d 1345, 1349-50 (3d Cir. 1997).

The government easily met its burden here. Although Rodriguez repeatedly refers to Caballo's murder as a Commonwealth offense, the second superseding indictment lists the murder as a charged offense and identifies it as an overt act in furtherance of the federal drug conspiracy. The federal government, through the DEA, had opened an investigation into this conspiracy and had interviewed Llaurador prior to his murder. Rodriguez's claim that he did not realize that he was helping to conceal a federal crime by murdering Llaurador is irrelevant. See United States v. Applewhaite, 195 F.3d 679, 687 (3d Cir. 1999) ("All that [a parallel provision in the Witness Protection Act] requires is that the government establish that the defendants had the intent to influence an investigation that happened to be federal.").

**B.  Genao's Claims**

**1.  Newly Discovered Evidence**

Genao first complains that the district court should have granted him a new trial under Fed. R. Crim. P. 33 based on his post-trial discovery of exculpatory evidence. Rule 33 allows a court to grant a new trial "if the interest of justice so requires." Fed. R. Crim. P. 33(a). We will only overturn the court's refusal to do so upon a showing that it manifestly abused

-22-

its discretion.  <u>United States</u> v. <u>Josleyn</u>, 206 F.3d 144, 160 (1st Cir. 2000).

Genao claimed in his Rule 33 motion that two co-defendants, Peña and Valle-Lassalle, each proffered sworn statements after the trial claiming that Genao did not participate in Caballo's murder.  He also claimed that a private investigator, Benny Soto, had interviewed Santodomingo, a leader of the conspiracy, who had been arrested for money laundering in 1994 and later pled guilty to drug trafficking charges arising out of the first superseding indictment in this case.  The investigator reported that Santodomingo would testify that Genao had not been involved in the drug conspiracy.  The district court denied Genao's motion for a new trial without conducting an evidentiary hearing. Upon receiving Genao's motion for reconsideration, the court held a hearing to consider it, and Peña, Valle-Lassalle, and Santodomingo testified.  Citing Genao's lack of diligence in seeking this evidence prior to trial and the witnesses' lack of credibility, the court again denied his motion for a new trial.

"A motion for new trial on the basis of newly discovered evidence will ordinarily not be granted unless the moving party can demonstrate that: (1) the evidence was unknown or unavailable to the defendant at the time of trial; (2) failure to learn of the evidence was not due to lack of diligence by the defendant; (3) the evidence is material, and not merely cumulative or impeaching; and

-23-

(4) it will probably result in an acquittal upon retrial of the defendant." United States v. Wright, 625 F.2d 1017, 1019 (1st Cir. 1980).  "The defendant must meet all four prongs of the Wright test in order to succeed on a Rule 33 motion.  A defendant's new trial motion must be denied if he fails to meet any one of these factors."  United States v. Colon-Munoz, 318 F.3d 348, 360 (1st Cir. 2003) (internal quotation marks omitted).

Peña testified that he was the triggerman in Caballo's murder and that Genao was not present at the murder scene.  In fact, he testified that he did not meet Genao until the two were imprisoned together prior to their federal trial.  When Genao's lawyer asked him why he had failed to present this testimony earlier, he answered:

> Well, I was in negotiation [with the government].  I mean, at one point in time, I was thinking of fighting my case, you know, of going to trial in my case, but then I started to think a lot about Genao and the fact that he had nothing to do with [Caballo]'s death. Because I really had never met Genao out in the street at all.  I never saw him.
>
> So when I finally made my agreement and I was already sentenced, I said, Well, I'm going to help him out because he really had nothing to do with any of this killing, because I was the one who killed [Caballo], and the ones involved in [Caballo]'s murder, the ones who were there for [Caballo]'s murder, was me and [Llaurador], and we were the only ones who were there at the lake when [Caballo] was killed.

-24-

On cross-examination, Peña admitted that, as part of his plea agreement, he accepted as true and correct the version of facts in counts one and three of the second superseding indictment, which stated that Genao participated in Caballo's murder. However, he claimed that he thought that this affirmation meant that he was admitting to the accusations in the indictment relating to his own actions and culpability, not necessarily to the facts and accusations relating to his co-conspirators.

Valle-Lassalle said that Genao never assisted with any of the drug loads and that Genao had nothing to do with Caballo's murder. Even though Genao asked him in jail to say that he was not guilty, Valle-Lassalle said that he did not come forward with this evidence earlier because he was awaiting trial. Valle-Lassalle repeatedly refused to implicate some of his co-conspirators in the murders and drug smuggling operations, prompting the government to ask: "It goes against every grain of your being to testify and implicate anyone that's not a cooperator or a dead person in criminal conduct; isn't that correct?" Valle-Lassalle answered simply, "Yes."

Santodomingo's testimony was less detailed. He stated that he met Genao through Ramos and that Genao did not do any drug work for him.

We have previously characterized post-sentencing exculpatory testimony of co-conspirators as being "inherently

-25-

suspect." United States v. Montilla-Rivera, 171 F.3d 37, 42 (1st Cir. 1999). Such witnesses have little to lose by fabricating stories designed to free their comrades, especially when, as here, the stories do not run the risk of implicating the witnesses in other criminal acts.[5] United States v. Simmons, 714 F.2d 29, 31-32 (5th Cir. 1983) ("[O]nce sentence has been imposed on a co-defendant, '. . . there is very little to deter the . . . co-defendant from untruthfully swearing out an affidavit in which he purports to shoulder the entire blame.'") (citation omitted; ellipses in original). Valle-Lassalle's admission that he was only willing to inculpate dead people and informants, and the contradictions between Peña's testimony at the evidentiary hearing and the facts recounted in his plea agreement, capture the limitations of the post-trial testimony of all three witnesses produced at the evidentiary hearing. Having presided at the lengthy trial of Genao and the co-defendants, and having heard the testimony of the co-conspirators produced at the hearing on the motion for a new trial, the district court did not remotely abuse its discretion in rejecting the argument that the testimony from Genao's co-conspirators "will probably result in an acquittal upon

---

[5]Santodomingo is serving a 276 month sentence after being indicted in the first superseding indictment and pleading guilty to narcotics trafficking. The record does not identify the crimes to which the other two witnesses pled guilty; however, Valle-Lassalle admitted that he is serving a life sentence and Peña admitted that he is serving a thirty year sentence.

retrial."  Wright, 625 F.2d at 1019.

## 2.  Confrontation Clause

At trial, the government called Edgar Delgado García, a Puerto Rico Commonwealth judge who was the local prosecutor when Llaurador started cooperating with authorities prior to his murder. Judge Delgado read two sworn statements that Llaurador had given to the police in the summer of 1996 regarding Caballo's murder.  In the first statement, Llaurador provided a detailed account of the night of the murder, including the plan that Genao and Peña developed to trap Caballo; the manner in which they killed him; and the way in which Caballo's truck got stuck on the side of the road after the murder.  In the second statement, Llaurador explained that Valle-Lassalle told him that he had given the order for Caballo's death because Caballo was going to tell the Colombians about the cocaine theft.  Genao objected to the admission of this hearsay testimony against him immediately before Judge Delgado testified.

The argument over the admissibility of Llaurador's statements principally involved the application of the forfeiture by wrongdoing doctrine,[6] which, as embodied in Rule 804(b)(6) of the Federal Rules of Evidence, creates an exception to the general

---

[6]The government also argued that Llaurador's statements contained sufficient indicia of reliability to be admissible under the catch-all provision in the hearsay rules.  See Fed. R. Evid. 807.

prohibition on the admission of hearsay testimony for "statement[s] offered against a party that has engaged or acquiesced in wrongdoing that was intended to, and did, procure the unavailability of the declarant as a witness." Genao claimed that he was in jail awaiting trial for Caballo's murder when Llaurador was murdered; therefore, he had nothing to do with the killing. Noting that Rule 804(b)(6) allows the admission of evidence against defendants who <u>acquiesced</u> in a hearsay declarant's murder, the government responded that the mere fact that Genao did not directly participate in the murder was immaterial. According to the government, a portion of Ramos's testimony demonstrated that Genao knew that Llaurador was going to be murdered and that Genao acquiesced in the murder. Specifically, Ramos had testified that Genao asked him for bail money when the two were imprisoned; when Ramos called Valle-Lassalle to tell him about this request, Valle-Lassalle told him to tell Genao that he should not be worried because he would be out soon. Nine days later, according to the government, Llaurador was murdered and Genao was set free. Therefore, according to the government, Genao acquiesced in Llaurador's murder. Apparently agreeing with the government's theory of acquiescence (the court did not elaborate on its ruling), the court admitted Llaurador's statements to the former Commonwealth prosecutor as evidence against Genao.

## a. **Crawford v. Washington**

As we recently noted, the Supreme Court's decision in Crawford v. Washington, 124 S. Ct. 1354 (2004), "changed the legal landscape for determining whether the admission of certain hearsay statements violates the accused's right to confront witnesses."[7] Horton v. Allen, 370 F.3d 75, 83 (1st Cir. 2004). Overturning earlier precedent that allowed a court to consider hearsay testimony against a criminal defendant if that testimony "bore particularized guarantees of trustworthiness," see, e.g., Ohio v. Roberts, 448 U.S. 56, 66 (1980), the Crawford Court held that, absent other grounds for admissibility, the Confrontation Clause categorically bars the admission of testimonial hearsay unless the declarant is unavailable and the accused has had a prior opportunity to cross-examine the declarant. Crawford, 124 S. Ct. at 1374 ("Where testimonial evidence is at issue . . . the Sixth Amendment demands what the common law required: unavailability and a prior opportunity for cross-examination."). Although the Court left for another day a comprehensive definition of "testimonial" hearsay, it stated that "[w]hatever else the term covers, it

---

[7]Genao filed a Fed. R. App. P. 28(j) letter, pro se, on March 30, 2004, citing Crawford. The government never filed a Rule 28(j) letter regarding that case. We heard oral argument in this case on March 2, 2004, and Crawford was published on March 8, 2004. Although Crawford was decided after Genao was convicted, we must apply this new precedent in his appeal. See, e.g., Hamling v. United States, 418 U.S. 87, 102 (1974) ("[A] change in the law occurring after a relevant event in a case will be given effect while the case is on direct review.").

applies at a minimum to prior testimony at a preliminary hearing, before a grand jury, or at a former trial; and to police interrogations," or other "extrajudicial statements . . . contained in formalized testimonial materials, such as affidavits, depositions, prior testimony, or confessions." Id. (internal quotation marks omitted).

We conclude that Llaurador's signed confession, presented under oath to the prosecutor in Puerto Rico, is testimonial hearsay within the meaning given by the Supreme Court. See, e.g., United States v. Saget, 377 F.3d 223, 228 (2d Cir. 2004) (discussing the parameters of "testimonial hearsay" in light of Crawford). Since Genao did not have the prior opportunity to confront Llaurador regarding his statements, we conclude that, absent some independent ground for admissibility, it was a constitutional error for the court to admit Llaurador's statements against Genao.

b. Forfeiture by Wrongdoing

As noted, the government drew upon the forfeiture by wrongdoing doctrine in arguing to the district court that Llaurador's hearsay statements were admissible against Genao because he had acquiesced in Llaurador's murder. Forfeiture by wrongdoing is an independent ground for the admissibility of hearsay testimony that survives Crawford. See Crawford, 124 S. Ct. at 1370.

-30-

Curiously, on appeal, the government essentially abandons the forfeiture by wrongdoing argument, limiting itself to this one statement in its brief: "Genao was aware of the order to kill Llaurador because he had been informed by Victor Manuel Valle Lassalle, a/k/a 'Manolo,' through David Ramos-Rivera, a/k/a 'Pecas' not to worry." Instead, it simply argues that both of Llaurador's statements were admissible because they were declarations against penal interest and were otherwise reliable. See Fed. R. Evid. 804(b)(3). Crawford makes these traditional hearsay arguments irrelevant. According to Crawford, Genao had a constitutional right to confront Llaurador that, as to testimonial hearsay, could not be overridden merely by showing indicia of reliability.

Under appropriate circumstances, the forfeiture by wrongdoing doctrine can provide an exception to the Confrontation Clause. See Crawford, 124 S. Ct. at 1370. But the glancing reference to the doctrine of forfeiture by wrongdoing in the government's brief does not give us any assistance in addressing this difficult waiver issue.[8] "We believe it is apodictic that

_____

[8]Without purporting to resolve anything, we suggest some of the difficulties involved in determining whether a defendant has "acquiesced" in wrongdoing that would forfeit his confrontation rights. The Seventh and Tenth Circuits have held that the scope of imputed responsibility for procuring the unavailability of a witness, under both Rule 804(b)(6) and the Confrontation Clause, is coextensive with conspiratorial liability under Pinkerton v. United States, 328 U.S. 640 (1946). See United States v. Cherry, 217 F.3d 811 (10th Cir. 2000); accord United States v. Thompson, 286 F.3d 950 (7th Cir. 2002) (adopting Cherry). Under Cherry, the hearsay and Confrontation Clause exceptions are met if "the wrongful

-31-

'issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived.'" United States v. Caraballo-Cruz, 52 F.3d 390, 393 (1st Cir. 1995) (quoting United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990)). This rule, though most commonly applied to defendant-appellants, may be "applie[d] with undiminished vigor when, as now, a prosecutor attempts to rely on fleeting references to unsubstantiated conclusions in lieu of structured argumentation." Caraballo-Cruz, 52 F.3d at 393. Although in certain circumstances we have the discretion to overlook waiver by inadequate argument by the government in a criminal case, see United States v. Rose, 104 F.3d 1408, 1414 (1st Cir. 1997) (court of appeals has discretion to overlook government's waiver of harmless error argument), it would be inappropriate in this case to make the government's argument for it on an issue both factually and legally complex.

---

procurement [of the witness's unavailability] was in furtherance, within the scope, and reasonably foreseeable as a necessary or natural consequence of an ongoing conspiracy." 217 F.3d at 820. However, Cherry requires the district court to determine the factors supporting conspiratorial liability at an evidentiary hearing conducted outside the jury's presence. Id. at 815.

Here, the district court did not make any factual findings on the applicability of conspiratorial liability, let alone conduct a separate hearing outside the presence of the jury. While Cherry may represent a sensible rule of law, the government's failure to argue it means that we lack the benefit of arguments on whether to apply Cherry to this case, either in its substantive (scope of liability) or procedural (determination of liability by separate hearing) aspects. These difficulties highlight the necessity of fully developed arguments on the forfeiture by wrongdoing doctrine.

### c.  Harmless Error

Although the government argued wrongly that Llaurador's statements were admissible as declarations against penal interest, it failed to argue in the alternative that, if the statements were erroneously admitted, the error was harmless.  See generally Fed. R. Crim. P. 52(a) ("Any error, defect, irregularity, or variance that does not affect substantial rights must be disregarded."); Delaware v. Van Arsdall, 475 U.S. 673, 684 (1986) (holding that harmless error review applies to Confrontation Clause violations); United States v. Reyes-Echevarria, 345 F.3d 1, 6 (1st Cir. 2003) ("We review challenges to the admissibility of evidence under the Sixth Amendment's Confrontation Clause for harmless error.").

Because the government has not argued harmless error, we could simply deem the issue waived, as we did for the forfeiture by wrongdoing issue, and vacate the relevant convictions of Genao. However, as noted, we have discretion "to overlook the government's failure to argue that the admission of the challenged evidence, if error, was harmless, and that [we] may therefore consider the issue of harmlessness sua sponte."  Rose, 104 F.3d at 1414.  Exercising this discretion "involves the balancing of many elements."  Id. at 1415.  If our sua sponte harmless error analysis led us to affirm Genao's conviction, we would have to engage in a nuanced analysis of the appropriateness of that sua sponte review.  Here, for the sake of completeness, and in light of our decision to vacate the

-33-

convictions for the serious crimes under review, we choose to explain why admission of Llaurador's statements cannot be deemed harmless.

"The government, not the defendants, bears the burden of establishing harmlessness." United States v. Casas, 356 F.3d 104, 121 (1st Cir. 2004), cert. denied sub nom. Segui-Rodriguez v. United States, 124 S. Ct. 2405 (2004). The analysis is case-specific, considering, "among other things, the centrality of the tainted material, its uniqueness, its prejudicial impact, the uses to which it was put during the trial, the relative strengths of the parties' cases, and any telltales that furnish clues to the likelihood that the error affected the factfinder's resolution of a material issue." Sepulveda, 15 F.3d at 1182.

We begin our harmless error analysis by describing the evidence implicating Genao in the murder of Caballo apart from Llaurador's hearsay statements. Ramos, the co-conspirator turned informant, described a conversation that he had with Genao in which Genao explained the course of events on the night of Caballo's murder. Genao explained to Ramos that Caballo wanted Peña to kill Llaurador because Caballo suspected Llaurador of stealing his all terrain vehicle ("ATV"). Genao joined Peña and Caballo in Caballo's white pickup truck to hunt for Llaurador. When they finally found Llaurador, Genao got in the car with him and explained that Caballo wanted to kill him but that he should not

-34-

worry because Genao and Peña were planning on killing Caballo instead. They drove to a remote location with Caballo's white pickup following behind and then disembarked. When Caballo told Peña to kill Llaurador, Peña shot Caballo instead. The three then loaded Caballo's body into the back of the pickup truck and were planning to dismember the body at Valle-Lassalle's when the truck became stuck. They were forced to abandon the truck and the body on the side of the road.

The government offered some corroboration of Ramos's testimony implicating Genao in the murder of Caballo. Soto testified that Valle-Lassalle "told [him] what had happened with [Caballo], that it had been [Genao] and [Peña], and that he had to do it because of the Colombian thing." Caballo's girlfriend testified that the last time that she saw Caballo was when he left her house with Peña and Genao on the night of his murder. She confirmed that Caballo's ATV had vanished and that the men brought weapons with them in Caballo's white pickup truck to search for Llaurador. Finally, Puerto Rico Police Agent Jorge Nazario Torres testified that he found Caballo's body in his pickup truck, which was stuck on the side of the road.

There is certainly some force to this evidence. If the issue before us was the sufficiency of the evidence to support the jury's finding that Genao engaged in a conspiracy to murder Caballo or that he aided and abetted the murder of Caballo, we would

conclude that the evidence was sufficient to support those convictions. However, the issue before us is not the sufficiency of the evidence. Instead, we must decide whether there is a reasonable possibility that the error at issue (the admission of Llaurador's statements) influenced the jury in finding Genao guilty of these murder-related charges. Before stating our conclusion on that issue, we summarize the statements of Llaurador that were presented to the jury by Judge (and former prosecutor) Delgado.

Delgado testified that he put Llaurador under oath and asked him to tell him everything that he knew about Caballo's murder. Llaurador responded in detail. He said that he saw Caballo's truck stopped near his home at 2:00 AM on July 15, 2000. Knowing that Caballo was mad at him for stealing the ATV, Llaurador thought that Caballo was either looking for the ATV or was on his way to visit Llaurador's girlfriend. So he drove to his girlfriend's house to see if Caballo was there. He was not; however, Caballo eventually drove near the house, and Genao got out of Caballo's truck and asked Llaurador to take him to buy gasoline. While they were driving in Llaurador's truck, Genao explained that Caballo wanted Genao and Peña to kill him for stealing the ATV but that they were planning on killing Caballo instead because Caballo was going to "snitch" regarding the cocaine theft. Genao repeatedly reassured Llaurador that nothing was going to happen to

him, and he told him to drive toward the cockfighting arena to meet Caballo and Peña.

After meeting the other two at the arena, Genao and Llaurador drove to a lake with Peña and Caballo following behind in Caballo's truck. Genao continued to reassure Llaurador that they were not planning to kill him. Peña and Genao switched trucks when they arrived at the lake. Llaurador then implored, "if you're going to kill me, kill me here and just leave me here." Peña responded: "Are you going to keep up with this? Just take it easy, we're not going to do anything to you." Llaurador followed Caballo's truck a little further up a path, and then all four men got out of their vehicles. Caballo grabbed Llaurador's shirt, pushed him up against one of the trucks, and told Peña to "[p]ump four shots into [his] face." Raising his arm, Peña said that he was going to pump four shots into Caballo's face and shot him in the face. Genao and Peña then began to argue about whether they should leave Caballo's body there or take it with them. They decided to put the body in the back of Caballo's truck, and Llaurador, driving alone in his truck, led the group away from the lake, with Peña and Genao quickly following in Caballo's truck. At some point, Llaurador noticed that the truck was not behind him anymore, and he turned back and found it stuck in a ditch on the side of the road. He heard two shots as he was backing up and, upon reaching the truck, was told that Peña shot Caballo two more

times because he got up and asked why Peña had shot him. Peña answered, "[b]ecause you're a mother fucker." Llaurador then drove Genao to his car and drove Peña to a public housing complex in Aguadilla. As they were driving, Genao told Llaurador that the original plan was to make Caballo "disappear" so that Genao could keep the truck.

Delgado testified that Llaurador provided another statement on September 13, in which he discussed Valle-Lassalle's relationship to the murder. Llaurador said that Genao told him on the way to the cockfighting arena that Valle-Lassalle told them to kill Caballo because he was going to "snitch" about the cocaine and that they were planning on taking the body back to Valle-Lassalle's afterward to "chop him up and make him disappear." That is why they took the body with them after the murder. Genao also told Llaurador that he was planning to dismantle the truck.

Llaurador added that he saw Valle-Lassalle a week after the murder, and the gangleader explained his rationale for killing Caballo and said that Peña had left the country. Valle-Lassalle also mentioned another death[9] at a parking lot of the Ducos housing project. Llaurador presciently noted to prosecutor Delgado that Valle-Lassalle would kill him if he found out about the statements he was then making and that he omitted the leader's involvement in his earlier statement "because Manolo is the one who orders the

---

[9]We take this to be a reference to Martin's murder.

killings." Finally, he said that he had not seen Peña since the murder and that he had not seen Genao since the two attended Caballo's wake.

These detailed statements of Llaurador, so similar in some of their details to the testimony of Ramos, are powerfully corroborative of the testimony offered by Ramos and others implicating Genao in the murder of Caballo. To treat these hearsay statements of Llaurador as merely cumulative (the harmless side of corroborative) would be unrealistic. Moreover, these statements were read into the record by a Commonwealth judge who was so identified to the jury. That association inevitably added to the weight of the hearsay testimony being offered, particularly since the principal non-hearsay evidence consisted of testimony by a co-conspirator (Ramos) and a cooperator (Soto), both of whose integrity might be more open to question than Llaurador's. Under these circumstances, we cannot exclude the reasonable possibility that the constitutional error at issue in the admission of Llaurador's statements influenced the jury in reaching its verdict that Genao was guilty of participating in a conspiracy to murder Caballo and that he aided and abetted that murder. Therefore, we must vacate those convictions.

We reach a different conclusion regarding the impact of the court's error on the jury's consideration of the drug conspiracy (count one) charge. Focusing almost exclusively on the

events surrounding Caballo's murder, Llaurador's erroneously-admitted statements say little about Genao's involvement in the drug smuggling work of the conspiracy. Moreover, the testimony of the two cooperating witnesses firmly established his participation in those activities. Ramos testified that Genao worked as a drug courier for him before Genao became a member of the conspiracy, delivering pounds of marijuana for Ramos to sell at the Montana housing complex. He described Genao's participation in two large drug shipments, a nine hundred to one thousand kilogram shipment in the fall of 1995 that the group smuggled on behalf of Ayala; and a shipment of cocaine in February 1996, which Genao also helped to transport and from which the conspirators stole kilos. Soto testified that Genao participated in an aborted effort to smuggle a large load of marijuana in June 1996. Genao was one of the captains of the boats and was supposed to be paid between fifty thousand and sixty thousand dollars, but they were never able to connect with their supplier.

On the basis of this evidence, we readily conclude that the district court's erroneous admission of Llaurador's statements was harmless beyond a reasonable doubt in securing convictions on count one of the second superseding indictment. See Casas, 356 F.3d at 121 (upholding a drug conspiracy conviction where "[o]ther evidence presented at trial, as well as the admissible testimony of

[the investigating agent] based on personal knowledge, clearly established that [the defendant] was a member of the conspiracy").