# United States Court of Appeals

## For the First Circuit

---

No. 03-1566

UNITED STATES OF AMERICA,
Appellee,

v.

JAIME PINILLOS-PRIETO,
Defendant, Appellant.

---

No. 03-1627

UNITED STATES OF AMERICA,
Appellee,

v.

RODRIGO CAMPUSANO,
Defendant, Appellant.

---

Nos. 03-1628
     03-1772

UNITED STATES OF AMERICA,
Appellee, Cross Appellant,

v.

NOLGIE RODRIGUEZ-ZAMOT,
Defendant, Appellant, Cross Appellee.

---

APPEALS FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO
[Hon. Carmen Consuelo Cerezo, U.S. District Judge]

---

Before
Selya, Lynch, and Lipez, Circuit Judges.

---

Jean Philip Gauthier for Jaime Pinillos-Prieto.
Stephen J. Golembe for Rodrigo Campusano.
Ira N. Loewy, with whom Michael A. Pizzi, Jr. and Bierman, Shohat, Loewy & Pizzi, P.A. were on brief, for Nolgie Rodriguez-Zamot.
Nelson Pérez-Sosa, Assistant U.S. Attorney, with whom Rebecca Kellog-De Jesús, Assistant U.S. Attorney, and H.S. Garcia, U.S. Attorney, were on brief, for the United States.

---

August 17, 2005

---

**LIPEZ, Circuit Judge**. These appeals stem from a multi-defendant drug conspiracy trial involving a "reverse sting" operation. Appellants were convicted of conspiring and attempting to possess, with intent to distribute, five or more kilograms of cocaine. They challenge the sufficiency of the evidence supporting their convictions, the admission of certain testimony by an undercover agent, and the jury instructions. We affirm the convictions.

The government cross-appeals from the district court's denial of a mandatory life sentence for Rodriguez under 21 U.S.C. § 841(b)(1)(A). However, we need not decide the correctness of that decision. In light of United States v. Booker, 125 S. Ct. 738 (2005), and without opposition from the government, we vacate all of the defendants' sentences and remand for re-sentencing under advisory sentencing guidelines.

## I.

### A.      Factual background

We recite the facts in the light most favorable to the verdict. United States v. Rodriguez-Marrero, 390 F.3d 1, 6 (1st Cir. 2004), cert. denied, 125 S. Ct. 1620 (2005). Nelson "Rafa" Rodríguez, an experienced government informant of Colombian origin, first met defendant-appellant Jaime Pinillos-Prieto ("Pinillos") in

Colombia in early 2001. In this meeting, Rafa[1] represented himself as a drug trafficker. Pinillos, in turn, represented himself as a facilitator of sorts who had access to potential cocaine buyers in the United States and the ability to launder drug money by using it to buy computers, which could then be imported legally into Colombia and sold.

In July 2001, Pinillos telephoned Rafa (who was in Puerto Rico at the time) from Miami and said that he had a customer to buy 100 kilograms (kilos) of cocaine. Rafa asked Pinillos if the customer had the money -- approximately $1.4 million, since the going rate was about $13,500 per kilo. Pinillos confirmed that the buyer had the money. During this telephone call, as in other communications, Rafa and Pinillos did not use the terms "cocaine" or "kilos," but rather the terms "laptops" and "computers," which, Rafa later testified, were code words designed to obscure their conversation in case law enforcement officers overheard them.

Rafa contacted his case agent at the Drug Enforcement Administration, who authorized him to proceed with a "reverse sting" operation. In a classic sting, government agents attempt to buy drugs from persons suspected of being drug sellers. In a reverse sting, government agents offer to sell drugs to persons suspected of being drug buyers.

---

[1]We refer to Rafa by alias mainly to avoid confusion with appellant Rodriguez-Zamot, but also because all witnesses so referred to him at trial.

In this reverse sting, Rafa would be part of a three-person team of "sellers," and would serve as the negotiator and principal liaison to the buyers. Nataya "Princesa" Posada, a Colombian national and occasional government informant, would pose as the owner of the drugs. Special Agent Anthony Toro-Zambrana ("Toro") of the Special Investigations Bureau of the Puerto Rico Department of Justice, an undercover narcotics agent, would pose as Princesa's bodyguard and, as a Puerto Rican, one who was familiar with Puerto Rico and could arrange certain logistics.

Rafa and Pinillos arranged to meet on July 9, 2001 in the España Bakery in Isla Verde, Puerto Rico to finalize a sale of 100 kilos at the market rate. At the appointed time, Rafa, Princesa, and Toro arrived at the bakery. Pinillos was already there, and joined them after they entered. The subsequent conversation was videotaped from outside the bakery, but no sound was recorded.

After initial introductions, Pinillos assured the sellers that he had $700,000 ready for the purchase.[2] However, he stated that his friends wanted first to buy one kilo and test its quality before committing to a larger purchase. Rafa and Princesa refused, saying they were there for a multi-kilo deal. Princesa pointed out that cocaine was traded wholesale in 25-kilo packages, and she would not open up a package just to extract one kilo. Rafa further

---

[2]Rafa and Pinillos had previously discussed paying $700,000 (half the purchase price) up front in Puerto Rico, and the remainder in New York when the drugs were actually delivered.

noted that Pinillos's proposal was not in the buyers' interests, since the sellers could easily provide a high-quality test kilo and then sell them 99 low-quality kilos. Rafa suggested instead that the buyers purchase an entire 25-kilo package, and the buyers could test one kilo from that package while remaining assured that the other 24 kilos were of equal quality.

Pinillos then went to another table and conferred with two other men whom the "sellers" had not met, defendants-appellants Nolgie Rodriguez-Zamot ("Rodriguez") and Rodrigo Campusano. Pinillos shortly returned and related that his friends had rejected the 25-kilo proposal because that type of deal was how undercover police agents did business. Rafa and Princesa then suggested that, instead of communicating through Pinillos as an intermediary, they should talk directly to the buyers themselves.

Pinillos led Rafa, Princesa, and Toro to meet Rodriguez and Campusano, who were sitting at a nearby table, and introduced the group. Rodriguez was the owner of the money and therefore the principal on the buyers' side. Campusano was identified as the liaison between Rodriguez and Pinillos. The group then resumed negotiations. Rodriguez insisted that he wanted to buy just one kilo, and proceed from there if he was satisfied with the quality. Princesa (who, as leader of the "sellers," was Rodriguez's counterpart) refused and made a counteroffer, which the buyers rejected.

Rodriguez and Campusano then abruptly left the bakery. Pinillos and Rafa followed them outside; Toro and Princesa remained behind. Rodriguez explained that he disliked doing business with women, and the way that Princesa wanted to arrange the deal was characteristic of a police sting. Outside the bakery, negotiations continued for another 15 or 20 minutes. Rodriguez was interested in making the purchase, but the two sides could not agree on various logistical details. The parties agreed to meet later that afternoon to continue talking.

That afternoon, the group met at the parking lot of the Plaza Carolina shopping mall. By established protocol, the leaders (Rodriguez and Princesa) would not attend this or later meetings. Thus, the buyers were represented by Pinillos and Campusano, and the "sellers" by Rafa and Toro. During this meeting, Campusano spoke via mobile phone with Rodriguez, who insisted on receiving the drugs and testing the quality before delivering the money. The buyers continued to argue that the sellers' proposals were how undercover police do business; the "sellers" countered that the buyers' proposals were how thieves do business.

Finally, the group reached an agreement. The transaction would involve two cars. First, Campusano would drive a car containing the money to the handoff site. After Rafa counted the money, the buyers would drive the car offsite. Then Rafa would signal for a car containing the drugs to come to the site.

Campusano would drive that car away, leaving Pinillos with the "sellers" as a guarantee, i.e., a hostage. Once the buyers had verified the quantity and quality of the drugs, they would return with the "money" car; the sellers would take the money and Pinillos would be released. Pinillos and Rafa later agreed that this transaction would take place on July 11, 2001 at the parking lot of the Metropol Restaurant.

At the appointed time, Rafa and Toro arrived in the parking lot and waited. Pinillos arrived first and the group waited for Campusano to come with the "money" car. Pinillos appeared somewhat nervous but assured Rafa and Toro that everything was in order -- he had seen the money, and the buyers were not planning to rob the "sellers." Rafa sensed that something was not right and asked Pinillos to call Campusano, but Pinillos replied that Campusano would not be available by telephone. Rafa then asked whether the buyers were going to pay for one kilo or 25 kilos. Pinillos did not answer, but appeared anxious. Both Rafa and Toro grew concerned that the transaction was not proceeding as planned and that their lives might be at risk.

Finally, Campusano arrived at the parking lot on foot. Toro decided that this was a bad sign. He called nearby agents, who surrounded the vehicle and arrested Pinillos and Campusano. Rodriguez was later arrested after a brief car chase. No drugs, money, or weapons were ever found on or near any defendant.

**B.      Trial**

On July 24, 2001, a grand jury returned a two-count indictment against Pinillos, Campusano, and Rodriguez.   Count I charged that defendants conspired to possess with intent to distribute five or more kilograms of cocaine, in violation of 21 U.S.C. § 846.   Count II charged that defendants, aiding and abetting each other, attempted to possess with intent to distribute five or more kilograms of cocaine, in violation of 18 U.S.C. § 2(a) and   21   U.S.C.   §   841(a)(1).      See   also   21   U.S.C. § 841(b)(1)(A)(ii)(II) (defining penalties for violations involving five or more kilograms of cocaine).

Defendants   were   represented   separately   but   tried together.   Rafa, Toro, and Princesa testified for the prosecution, presenting essentially identical accounts of the conversations at the three meetings (minus Princesa for the last two meetings). Rafa and Toro further testified on the use of code words in drug transactions, based on their experience investigating such deals. All three defendants testified and offered innocent explanations for their business in Puerto Rico:  Pinillos was there to broker a computer sale; Rodriguez was visiting family; and Campusano was there as a favor to Pinillos.

The jury instructions -- to which the defendants did not object -- required the jury to find, first, whether the defendants conspired and/or attempted to possess with intent to distribute

cocaine; then, by special verdict form, whether "the quantity of cocaine involved [in each count] was more than five kilograms as charged in the indictment?"  The jury found all defendants guilty on both counts, and that the amount involved was more than five kilograms.

**C.        Sentencing**

The pre-sentence report computed the defendants' offense levels on the basis that the conspiracy involved 100 kilograms of cocaine.  This led to a base offense level of 36.  All three defendants objected to the 100 kilogram figure, arguing that they were not reasonably capable of purchasing that amount of cocaine because they did not have nearly enough money for such a purchase. The district court disagreed and found that the drug offenses involved 100 kilograms of cocaine.  It therefore applied a base offense level of 36 for each defendant.  <u>See</u> U.S.S.G. § 2D1.1(c)(2).

For Pinillos and Campusano, the court then applied a two-level enhancement for obstruction of justice under U.S.S.G. § 3C1.1, resulting in a total offense level of 38.[3]  That total offense level led to guideline ranges of 235-293 months, and the court sentenced both Pinillos and Campusano to two concurrent terms of 235 months.

---

[3]The basis for the obstruction of justice enhancement was perjury at trial.

For Rodriguez, there was an additional issue. The government argued that Rodriguez's prior convictions mandated a sentence of life imprisonment under 21 U.S.C. § 841(b)(1)(A), which states that "[i]f any person commits a violation of this subparagraph . . . after two or more prior convictions for a felony drug offense have become final, such person shall be sentenced to a mandatory term of life imprisonment without release." However, a question arose as to whether Rodriguez had properly been notified that the government intended to introduce prior convictions to seek an enhanced sentence under § 841. Prior convictions may not be used to increase the sentence for a drug offense "unless before trial . . . the United States attorney files an information with the court (and serves a copy of such information on the person or counsel for the person) stating in writing the previous convictions to be relied upon." 21 U.S.C. § 851(a)(1). The record indicated that the government had, just minutes before jury selection, filed an information alleging Rodriguez's prior convictions, but it was not clear whether the information had been timely served.

The court apparently concluded that Rodriguez had not received adequate notice, and therefore declined to consider Rodriguez's criminal history for purposes of the mandatory life sentence provision. Instead, it applied a two-level enhancement for obstruction of justice under U.S.S.G. § 3C1.1[4] and a two-level

---

[4]For perjury at trial. See supra note 3.

enhancement for being a leader or manager under U.S.S.G. § 3B1.1(c), resulting in a total offense level of 40. Combined with his career offender status, that offense level led to a guideline range of 360 months to life. The court sentenced Rodriguez to two concurrent terms of 360 months.

Defendants timely appealed their convictions and sentences. The government cross-appealed from the court's denial of a mandatory life sentence for Rodriguez under 21 U.S.C. § 841(b)(1)(A). We begin with appellants' challenges to their convictions.

## II.

All three appellants argue that the evidence is insufficient to sustain their conspiracy or attempt convictions. We review such challenges de novo, "drawing all reasonable inferences in favor of the verdict, to ascertain if a rational jury could have found that the government proved each element of the crime beyond a reasonable doubt." Rodriguez-Marrero, 390 F.3d at 12 (quotation marks and citation omitted). Appellants collectively[5] raise four different arguments in support of their insufficiency claims: (1) the parties never mentioned "cocaine" or "kilos," but rather were negotiating for the sale of computers; (2)

_____

[5]To be precise, Pinillos argues the first and third points, Campusano argues the second, and Rodriguez argues the fourth. That each appellant forfeited the issues that he did not himself raise turns out not to matter since each argument fails on its merits.

-11-

even if appellants actually intended to arrange the sale of cocaine, no agreement was reached because the parties could not agree on how much to sell or how to structure a two-phase transaction; (3) any desire to purchase drugs was inchoate and would be impeded by factual impossibility since appellants lacked the money to purchase anywhere near the quantities of cocaine alleged; and (4) if an agreement was reached, appellant Rodriguez was not present when it was reached, and if an attempt was made, he was not present when it was made.  We address each in turn.

## A.         Cocaine versus "Computers"

This argument is readily dispatched.  Both Rafa and Toro testified extensively on the use of code words in drug transactions, and the jury was entitled to believe the government witnesses over Pinillos, who insisted that it was all some sort of misunderstanding arising from a failed negotiation over Compaq Presario laptops.[6]  Furthermore, it is not quite true that the parties never mentioned "cocaine" or "kilos."  During its cross-examination of Pinillos, the government confronted him with the transcript of a telephone conversation in which he told Rafa

---

[6]We also note that both Campusano and Rodriguez testified that they knew nothing about computers, which would tend to support the government's version.

"[t]hat they stole from me six, one.  There's my kilo, brother.
There's my kilo."[7]

## B.        Alleged Lack of Agreement

This argument (which is addressed only to the conspiracy
charge, since attempt does not require an agreement) also fails.
First, a rational jury could conclude from the evidence at trial
that, despite initial disagreements about the logistics of the
transaction, the group eventually reached an agreement during the
second meeting.  Rafa and Toro testified that Pinillos and
Campusano, in communication with Rodriguez, agreed with them to a
detailed and somewhat complicated protocol involving two cars, a
hostage, and opportunities to inspect both money and drugs before
the final exchange.

But even if that evidence were somehow insufficient, the
jury could have convicted based on an agreement among the
defendants themselves.  The jury could have found an agreement
among the three defendants (or even two separate interlocking
agreements between pairs of defendants) even if defendants never
reached any agreement with the government agents. The testimony of
the government witnesses regarding the conduct of the defendants at
the various meetings was a sufficient basis for the jury to

_____

[7]While the term "kilobyte" may be used in reference to
computers, the jury was entitled to infer that "kilos" meant
kilograms of cocaine, not kilobytes.  Moreover, Pinillos did not
offer any explanation of his remark about "kilos" other than to
deny that he said it.

conclude that the defendants had agreed amongst themselves to obtain at least five kilograms of cocaine. See, e.g., United States v. Martinez-Medina, 279 F.3d 105, 113-14 (1st Cir. 2002) ("The jury may infer an agreement circumstantially by evidence of, inter alia, a common purpose (such as a purpose to sell illicit drugs), overlap of participants, and interdependence of various elements in the overall plan.").

**C.      Lack of Money**

To be sure, the fact that the government never recovered anything near the funds necessary to pay for even one kilogram of cocaine was a factual weakness. But it was not a fatal weakness. Pinillos repeatedly assured the government witnesses (before arriving in Puerto Rico, at the España Bakery, and at the final meeting) not only that the money was available, but that he had seen it. The jury was entitled to believe these statements, and to infer that the money was secreted somewhere unknown to the government.

**D.      Rodriguez's Connection**

Finally, Rodriguez argues that, even if there was a conspiracy and an attempt, his involvement was too peripheral to link him to either. But the government witnesses provided a sufficient basis to link him to both charges. All three government witnesses testified that, at the España Bakery meeting, Rodriguez was acting as the leader and decisionmaker; Rafa testified that

Rodriguez was introduced as such. Both Toro and Rafa testified that Pinillos and/or Campusano took direction from Rodriguez by cell phone at the second meeting, and all three government witnesses confirmed that, according to the usual protocol, the leader would only be present for the initial meeting, and certainly not for the actual handoff. Thus, the jury was entitled to infer that he was a member of the conspiracy, and either that he directly aided or abetted the other two defendants in their attempt, or was liable for their foreseeable acts within the scope of the conspiracy. See Pinkerton v. United States, 328 U.S. 640, 647 (1946).

For these reasons, we reject appellants' argument that the evidence was legally insufficient to support the verdict.

### III.

Appellants argue that the district court committed three errors during the course of the trial. All three appellants argue that the district court allowed improper and unfairly prejudicial expert testimony when it permitted Toro to testify, without any evidence of violence or guns in this case, that drug organizations are dangerous and keep their drugs near their firearms. Rodriguez makes two further arguments: (1) that the jury instructions failed to state that the jury could only convict a defendant of conspiracy if it found that the defendant conspired with at least one person who was not a government agent; and (2) that the instructions

-15-

failed to incorporate certain principles from the Sentencing Guidelines regarding calculation of drug quantity in a reverse sting.  We reject all of these arguments.

A.          **Toro's Testimony**

1.          The Challenged Testimony

Before trial, Pinillos moved in limine to exclude expert testimony regarding the topic of coded references to drugs and drug trafficking, on the ground that the government had not complied with its obligation to disclose expert testimony under Fed. R. Crim. P. 16(a)(1)(E) (2002).[8]  The government explained that it planned to ask both Toro and Rafa to testify about the use of code phrases in drug deals, and suggested that this was lay opinion testimony.  The district court denied Pinillos's motion, but held that the proposed testimony would be "regarded as expert testimony" and ordered the government to disclose "any information that is relevant to qualifying [a witness] as an expert to testify as to the meaning of drug related or coded drug phrases."

Despite the pretrial wrangling, the government never actually moved to qualify Toro as an expert witness.  Instead, early in its direct examination, after eliciting Toro's background and experience, it began asking general questions about the nature

---

[8]That provision has subsequently been renumbered Fed. R. Crim. P. 16(a)(1)(G) (2005), but the 2002 version is otherwise virtually identical to the present version.

of drug organizations and, in particular, their violent nature. (No questions had yet been asked concerning code words.)

The first substantive question that the government asked of Toro was, "What is your experience with how drug organizations operate as far as how do they maintain control of drugs <u>or the guns</u>?" (Emphasis added). After a defense[9] objection, the government rephrased the question without reference to guns, and Toro answered that drug organizations had members "who are engaged in safekeeping and protecting the drugs." The government then asked, "And how do they protect the drugs?" Over a defense objection, Toro was permitted to answer that the drugs "are kept in a hidden place where they are protected with firearms."[10]

Testimony about the dangerous nature of drug organizations recurred later in Toro's direct examination, when he

---

[9]Typically, in a multi-defendant case the district court will provide by standing order, or from the bench, that an objection made by one defendant will suffice to preserve the issue for all defendants. <u>Cf.</u> D.P.R. Crim. R. 117(b)(10) (providing that counsel should be prepared to discuss these issues at pretrial conference). The record is not clear as to whether that happened here. However, the government has advised us that, despite the apparent absence of an applicable order from the district court, it is the general practice in the District of Puerto Rico to treat an objection by one defendant as applicable to all defendants. Because of the uncertainty, we give appellants the benefit of the doubt. We do, however, advise future litigants to seek a ruling on the record regarding such matters.

[10]The court then sustained defendants' objection to the government's question, "How dangerous is your job?"

opined as to why the leader of a drug organization would not be physically present for the actual handoff:

> The most crucial and dangerous moment during the work of an undercover agent and everyone engaged in drug business is that time when the drugs and the money are handed over. Based on my experience, this is the point in time when any of the people involved, for any reason at that point in time, may lose his or her life.

Defendants objected on the ground that the testimony was inflammatory; the objection was overruled.

When discussing the meeting at the España Bakery, the government asked Toro whether, in his experience, drug traffickers bring innocent people to negotiations for the sale of drugs. Toro answered that they do not. The following discussion ensued:

```
Q.    Why would you not bring in innocent
      people?
A.    Because it could cause the life of that
      innocent person, to be in a drug
      transaction.

      MS. PLAZA: Objection, Your Honor.
      THE COURT: Overruled.
. . .

Q.    So when these drug deals happen, is it
      dangerous?

      MS. PLAZA:      Objection.
      MS. LIZARRIBAR: Objection.
      THE COURT: Overruled.
      THE WITNESS:  Yes, sir.

BY MR. SCHULTE:

Q.    Why is it dangerous?
A.    Because when you are involved in a drug
      transaction, you have drugs and money
      involved.  No one wants to have their
```

drugs stolen; no one wants to have their money stolen, and that's practically [sic] when there is large amounts of money involved and large amounts of drugs involved.

Later, when discussing the second meeting at the Plaza Carolina, Toro explained that if he "had not demanded to see the money, it could look as though we were cops and things could get dangerous." The prosecutor asked for clarification, and Toro explained:

> In a drug transaction where you have agents -- law enforcement agents from Puerto Rico and people who are engaged in drug trafficking, should these people become aware that we are agents, as has happened, it could cost us our lives.

The defense objected "as to what has happened in other cases," and the court sustained that objection, allowing into evidence, in the court's words, "that if these people find out that they are law enforcement, it could cost their lives."

The final contested statements came during Toro's explanation as to why he felt "insecure" and "unsure" in the car with Pinillos at the delivery site. Toro explained that at that time he "didn't know if Campusano and Pinillos were with other people." The government asked for clarification as follows:

> Q. What do you mean with other people?
> A. Maybe they were accompanied by other members of their organization which could place --
>
> MS. PLAZA: Objection, Your Honor.
> THE COURT: Overruled.
> THE WITNESS: -- which could place at stake both the informant's life and my life.

-19-

2.    Analysis

Appellants argue that these statements were erroneously admitted because (1) they were not a proper subject of expert testimony, see Fed. R. Evid. 702, and (2) they created a risk of unfair prejudice that substantially outweighed any probative value, see Fed. R. Evid. 403.  The government, perhaps missing the thrust of appellants' argument on appeal (which is not directed at the testimony regarding code words, but rather at that regarding violence), responds that code words are an appropriate subject for expert testimony, and the code word testimony was not prejudicial.[11] It also argues that Toro's testimony would have been admissible as lay opinion testimony under Fed. R. Evid. 701.  We review the court's decision to admit the testimony for abuse of discretion. United States v. Ayala-Pizarro, 407 F.3d 25, 27 (1st Cir. 2005).

Appellants' argument under Rule 702 is easily dispatched. "It require[s] no special expertise for [an officer] to conclude, based on his observations, that places which sell drugs are often protected by people with weapons."  Ayala-Pizarro, 407 F.3d at 29 (rejecting challenge to admission of such testimony as improper expert testimony).  That type of testimony is admissible as lay opinion under Rule 701.  See Ayala-Pizarro, 407 F.3d at 28-29.  The same reasoning applies to the other testimony to which appellants

_____

[11]Since appellants do not challenge on appeal (and did not contemporaneously object to) the code word testimony, we do not address it.

-20-

object, e.g., that the moment when the drugs and money are handed over is the most dangerous part of the work of an undercover agent. As in Ayala-Pizarro, these matters were "well founded on personal knowledge and susceptible to cross-examination," id. at 28 (quotation marks and citation omitted), and appropriate for lay opinion testimony.

Nor was the testimony inadmissible under Rule 403, under which evidence "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice." Fed. R. Evid. 403. "Trial judges enjoy wide latitude in making Rule 403 rulings and are only overturned after a showing of an egregious error." United States v. Kornegay, 410 F.3d 89, 96 (1st Cir. 2005). The challenged statements had considerable probative value regarding, respectively, why the government might come to a drug transaction in which it planned to sell drugs without the actual drugs; why the leader of a drug organization would not be physically present for the actual handoff; why it would be unlikely that any defendant who was present at the España Bakery meeting would be a mere innocent bystander; why it was important for the government agents to demand to see the money during the Plaza Carolina meeting; and why Toro called in the arrest before the "sale" had been consummated. To a significant extent, Toro's testimony about the dangerousness of drug transactions simply helped to explain his own conduct.

At the same time, any danger of unfair prejudice was substantially dissipated. The first four of the five disputed references to guns or violence were general statements about how drug organizations typically operate, offered principally to explain Toro's own actions; only the last statement suggested that these particular defendants might potentially have some involvement with violence. All five statements were counterbalanced by the government's open concession (and Toro's admission on cross-examination) that no weapons were ever found on or near any defendant in this case. We do not discount that the testimony may have increased the impact of Toro's testimony in a manner unfavorable to appellants. But that is not enough to make a violation of Rule 403. "Virtually all evidence is prejudicial -- if the truth be told, that is almost always why the proponent seeks to introduce it -- but it is only unfair prejudice against which the law protects." United States v. Pitrone, 115 F.3d 1, 8 (1st Cir. 1997). The district court did not abuse its discretion in concluding that the danger of unfair prejudice from the disputed testimony did not substantially outweigh its probative value.

**B.**      **Instructions Regarding Conspiracy with Government Agent**

Both before and after the jury charge, all three defendants requested an instruction that a jury can only convict a defendant of conspiracy if it finds that he conspired with at least one person who was not a government agent. In other words, there

must be at least two true conspirators, and "government agents do not count." United States v. Giry, 818 F.2d 120, 126 (1st Cir. 1987). The district court denied the request on the ground that the instruction is only applicable when the facts support the inference that the defendant and one or more government agents were the only participants in the agreement, and that scenario was not even the defense's theory of this case, let alone a reasonable inference from the facts. On appeal, Rodriguez maintains that the refusal to grant this instruction requires a new trial.

The parties spar over the standard of review, but we need not resolve that controversy. Instead, we will assume, in the appellant's favor, that the de novo standard applies. In order to conclude that Rodriguez had formed an agreement to possess with intent to distribute cocaine, but that he had reached this agreement solely with government agents, the jury would have had to accept an unlikely hybrid of Rodriguez's testimony and the government's theory of the case. Nevertheless, as unlikely as this version of events may be, we will also assume for argument's sake that the district court erred in denying the instruction.

In all events, the error was harmless in this case. See United States v. Duff, 76 F.3d 122, 127-28 (7th Cir. 1996) (where testimony showed that defendant "participated in many of the [drug] organization's activities as one of its supervisors" whereas government agent "entered at the bottom[,] . . . . [n]o reasonable

jury would have thought that [defendant] agreed only with [the government agent]" and therefore the failure to give the instruction was harmless).  In order for the instruction to have made a difference, the jury would have had to believe the following version of events.  Rodriguez, who lives in Miami, flew to Puerto Rico.  The next day, he visited Campusano -- who also lived in Miami and whom he had known for about a year and a half -- at his hotel.  Campusano introduced Rodriguez to Pinillos, with whom he was staying.  At no point did Rodriguez agree with either Campusano or Pinillos to obtain cocaine for distribution.  The next day, Rodriguez accompanied Campusano and Pinillos to the España Bakery. So far, Rodriguez had not agreed with anyone to obtain cocaine.  At the bakery, all three defendants met with all three government agents, but Rodriguez still had not, by either words or conduct, agreed with either Campusano or Pinillos to obtain cocaine.  Later, all three defendants stepped outside and talked with Rafa.  At this point, and not before, Rodriguez reached an agreement to obtain cocaine -- with Rafa alone, because Campusano and Pinillos were merely bystanders.  Finally, Rodriguez either never relayed instructions to Campusano at the Plaza Carolina mall via mobile phone, or did it in such a way that he did not bring Campusano (let alone Pinillos) into the agreement.

As noted, this is an unlikely scenario, to put it mildly. At the same time, the evidence for the government's version of

events was considerably stronger. Indeed, the theory of the case under which the instruction could have made a difference was never advanced by Rodriguez or any other witness, and was less plausible than the theory of innocence that Rodriguez actually professed. To accept the hybrid version of events under which the instruction might have mattered, the jury would have had to disbelieve both the government witnesses (who testified that Rodriguez participated with Campusano and Pinillos in reaching an agreement) and Rodriguez himself (who testified that he was not involved in any discussions relating to the purchase of anything). Because the evidence for the government's version of events was so much stronger than the evidence for the version of events under which an error could have affected the verdict, we are easily satisfied that any such error "does not affect substantial rights [and therefore] must be disregarded." Fed. R. Crim. P. 52(a). Cf. Gillespie v. Sears, Roebuck & Co., 386 F.3d 21, 30 (1st Cir. 2004) (in civil cases, "[r]ecognizing that a jury is likely to prefer a better supported theory to one less supported, we have generously applied the harmless error concept to rescue verdicts where we could be reasonably sure that the jury in fact relied upon a theory with adequate evidentiary support").

C.      **Instructions Regarding Drug Quantity Calculation**

The district court required the jury to answer a question on a special verdict form: "Do you unanimously agree by proof

beyond reasonable doubt that the quantity of cocaine involved in the conspiracy charged in count 1 was more than five kilograms as charged in the indictment?" A similar question was applied to the attempt charge. The jury answered yes to each question for each defendant.

Rodriguez argues that the jury instructions were defective because they did not incorporate certain standards found in the Sentencing Guidelines for determination of drug quantity in a reverse sting:

> In an offense involving an agreement to sell a controlled substance, the agreed-upon quantity of the controlled substance shall be used to determine the offense level unless the sale is completed and the amount delivered more accurately reflects the scale of the offense. . . . [I]n a reverse sting, the agreed-upon quantity of the controlled substance would more accurately reflect the scale of the offense because the amount actually delivered is controlled by the government, not by the defendant. If, however, the defendant establishes that he or she did not intend to provide, or was not reasonably capable of providing, the agreed-upon quantity of the controlled substance, the court shall exclude from the offense level determination the amount of controlled substance that the defendant establishes that he or she did not intend to provide or was not reasonably capable of providing.

U.S.S.G. § 2D1.1, cmt. n.12 (2002).[12]

---

[12]This was the version of application note 12 available at the time of trial. It has since been amended slightly.

Rodriguez argues that application note 12 should have been incorporated into the jury charge, and that the jury might have found that since there was no evidence that he had even a tenth of the money needed to buy five kilograms of cocaine, he was not reasonably capable of purchasing five kilograms. Because Rodriguez did not request this instruction below, we review for plain error. United States v. Medina-Martinez, 396 F.3d 1, 8 (1st Cir. 2005). Under this rigorous standard, Rodriguez must show that "(1) an error occurred, (2) the error was clear or obvious, (3) the error affected his substantial rights, and (4) the error also seriously impaired the fairness, integrity, or public reputation of judicial proceedings." Id.

It may seem unusual to suggest that a principle from the Sentencing Guidelines, which are applied by the court (even under the post-Booker advisory regime), should govern a statutory determination. Indeed, Rodriguez has not cited any case from any court holding that any aspect of the Sentencing Guidelines must be incorporated into jury instructions. He does, however, cite United States v. Lindia, 82 F.3d 1154, 1160 (1st Cir. 1996), for the proposition that "[a]pplication note 12 applies for the purposes of both the Sentencing Guidelines and the statutory penalties under 21 U.S.C. § 841(b)." But Rodriguez has cited no case, and we have found none, suggesting that Lindia has any applicability to jury

-27-

quantity determinations, or that application note 12 must be incorporated into jury instructions.[13]

That said, we need not decide whether it would have been correct to grant a request to instruct the jury that it should exclude "the amount of controlled substance that the defendant establishes that the defendant did not intend to provide or purchase or was not reasonably capable of providing or purchasing" if the defendant had requested such an instruction, nor whether it would have been error to deny a timely request for such an instruction, nor even whether it was error to fail to so instruct sua sponte. The error, if any, was not "clear or obvious," and therefore Rodriguez's challenge fails under plain error review.

**IV.**

Although the appellants allege various errors in sentencing, we need not address their claims. All three defendants challenged the district court's calculation of the drug quantity as 100 kilograms. The government concedes that all three defendants preserved claims at sentencing under Apprendi v. New Jersey, 530 U.S. 466, 490 (2000), which in turn suffices to preserve claims under United States v. Booker, 125 S. Ct. 738 (2005). See United States v. Antonakopoulos, 399 F.3d 68, 76 (1st Cir. 2005). We accept those concessions without further inquiry. The government

---

[13]We also note, but do not rely upon, the fact that other aspects of Lindia have been called into doubt. See United States v. Eirby, 262 F.3d 31, 36 (1st Cir. 2001).

-28-

further conceded at oral argument that it cannot show that the error was harmless, and therefore remand is appropriate. Consequently, all three appellants' sentences will be remanded for resentencing in light of Booker.[14]

V.

The government cross-appeals from the district court's refusal to impose upon Rodriguez a mandatory life sentence based on its conclusion that he had inadequate notice of the government's intent to seek that sentence. If the prosecution intends to seek an enhanced sentence under 21 U.S.C. § 841 based on prior convictions, it must "before trial . . . file[] an information with the court (and serve[] a copy of such information on the person or counsel for the person) stating in writing the previous convictions to be relied upon." 21 U.S.C. § 851(a)(1).

There is no dispute that the prosecution filed and served a § 851 information on October 17, 2002, the first day of trial. The question is whether it was served "before trial." The government contends that it filed and personally served the information on October 17, 2002, the morning that the trial began, just before jury selection started. "While such cliff-hanging practices are not wise," if "the filing was made before jury

---

[14]Because we vacate appellants' sentences in their entirety, we need not decide appellants' claims that the district court erroneously (1) determined role in the offense for Campusano and Rodriguez, (2) calculated the drug quantity under U.S.S.G. § 2D1.1, cmt. n.12, or (3) set the conditions of supervised release.

selection, [then] that is all that was required." <u>United States</u> v. <u>Cartagena-Carrasquillo</u>, 70 F.3d 706, 715 (1st Cir. 1995).

According to the courtroom deputy's notes for the morning of October 17, 2002, jury selection was delayed because Campusano's attorney was in a hearing in a different courtroom.  The notes record that Campusano's attorney arrived at 10:45 A.M. and joined a bench conference already in progress.  Jury selection began several minutes later, after the bench conference ended. Critically, the notes indicate that the information was filed at 10:45 A.M. -- the same time that Campusano's attorney arrived, and a few minutes before jury selection began.  That notation was consistent with the prosecutor's statement at the sentencing hearing that he personally filed the § 851 information, and handed copies to Rodriguez and his counsel, shortly before jury selection began.  However, while the notes suggest that the information was timely <u>filed</u>, they say nothing about when it was <u>served</u>.[15]

On March 18, 2003, the district court found that the information was timely filed and served, and denied Rodriguez's motion to strike the information.  Rodriguez's sentencing hearing was held later that same day, and his counsel requested reconsideration.  Counsel disputed the government's version of

---

[15]The government also served the information by mail on October 17, 2002.  Again, the date on the certificate of service does not indicate the <u>time</u> of service.

events, and noted that there was nothing in the record stating that Rodriguez had received the information.  He further argued:

> A lot of times what the U.S. Attorney will do, Judge, is they'll stand up and announce, to make sure there's no problem, they'll stand up and announce in open court that notice has been filed, and the judge will voir dire the defendant to make sure that the defendant is aware of the fact that this has been filed. It's kind of like a prophylactic remedy to make sure that these types of issues do not occur.  I'm not aware of anything in the record to suggest that the government announced this in open court and that Mr. Rodriguez was voir dired to make sure that he was aware of the filing.

Shortly afterwards, the court conducted a bench conference, then stated for the record:

> At sidebar the Court was discussing with the attorneys whether the lack of voir dire by the Court directly with the defendant would preclude the enhancement because of prior convictions.  We were discussing whether it is a requirement for the Court to voir dire the defendant as to the information that has been filed in Court, by informing him that this information has been filed in which the allegations as to prior convictions are such-and-such, and then asking him if he affirms or denies that he was previously convicted or that the convictions were invalid.
>
> That did not occur, and in all fairness to the defendant, I will state that for the record.  We were waiting for [Campusano's counsel] to come, and the matter of the information was taken up at the informal sidebar conference, where the government had filed it and defendant counsel had previously been given notice and so had the defendant. On that I'm very clear, that he received -- the filing was done before, the notice was done before the actual selection of the jury and voir dire.

-31-

> However, if the dialogue of the Court with the defendant is a requirement is something that I don't have an answer to right now.

The court then took a brief recess, and during the recess issued a written order stating:

> Although the Court is convinced, as stated in its previous Order, that the filing of the Information certifying that defendant committed this offense after two prior convictions was made before the selection of the jury commenced and that he was notified of the Information before voir dire started, the Court acknowledges that it did not conduct any inquiry directly with defendant as to his awareness of such filing and of the allegations of the Information, nor whether he affirmed or denied his previous convictions or claimed their invalidity. Since this is the practice followed by the Court in other cases, its absence in this case casts doubt on whether defendant [Rodriguez] was fully aware of the consequences of the filing of the Information and was able to rethink his decision to stand trial. For these reasons, the Court will not apply the enhancement based on his prior convictions.

The court's final order could be read in two ways. The government interprets it to state, as a matter of law, that § 851 notice is not complete unless the court addresses the defendant concerning the information before trial begins.[16] If so, it would be an incorrect statement of law; there is no basis for such a requirement. However, Rodriguez argues that the court was simply making a factual inference: since this district court judge

---

[16]Such a colloquy before trial would be entirely separate from the post-conviction, pre-sentencing colloquy required by § 851(b).

consistently, in other cases, discusses the information with the defendant on the record, the fact that no such discussion occurred in this case is evidence suggesting that the information may not have been timely served on Rodriguez.  In other words, under this latter view, the absence of colloquy is relevant as part of a factual determination, not a legal requirement in itself.

The final written order is at least susceptible to the reading that Rodriguez advocates.  However, the government's interpretation seems more consistent with the district court's statement at the sentencing hearing that it was "very clear, that [Rodriguez] received -- the filing was done before, the notice was done before the actual selection of the jury and voir dire," and its expression of uncertainty only as to whether "the dialogue of the Court with the defendant is a requirement."

Because the stakes of construing the court's order incorrectly are potentially high, and a remand is already warranted under Booker, we decline to interpret the order.  Rather, we suggest that the district court, on resentencing, clarify its original ruling.  If the court initially declined to impose the enhanced sentence based solely on the conclusion that § 851 requires a colloquy before trial -- a conclusion we have now rejected -- then the court should impose the enhanced sentence. If, on the other hand, the court correctly recognized that § 851 does not require a colloquy before trial, and its written order

reflected a factual determination of the events of October 17, 2002, or if there were other valid grounds for the order not apparent to us, the court need not impose a life sentence.

## VI.

The convictions of appellants are **affirmed**. Their sentences of imprisonment are **vacated** and **remanded** for re-sentencing in light of <u>Booker</u>. For Rodriguez, the court should further determine whether a mandatory life sentence under 21 U.S.C. § 841(b)(1)(A) applies. Whatever its intention, the court should, however, make reasonably specific findings that clarify its thinking.

**<u>So ordered</u>**.