

Villanova University School of Law

2006 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

8-24-2006

# USA v. Cimera

Precedential or Non-Precedential: Precedential

Docket No. 05-2360

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2006

Recommended Citation

"USA v. Cimera" (2006). *2006 Decisions.* Paper 499.
http://digitalcommons.law.villanova.edu/thirdcircuit_2006/499

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova University School of Law Digital Repository. It has been accepted for inclusion in 2006 Decisions by an authorized administrator of Villanova University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

PRECEDENTIAL

IN THE UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

Case No: 05-2360

UNITED STATES OF AMERICA,

Appellant

v.

KEITH CIMERA,

Appellee

_____

On Appeal from the United States District Court
for the District of New Jersey
District Court No.: 03-CR-00529-3
District Judge: The Honorable John W. Bissell, Chief Judge

_____

Argued July 13, 2006

Before: SMITH, WEIS, and ROTH, *Circuit Judges*

(Filed: August 24, 2006 )

_____

George S. Leone
Office of the United States Attorney
970 Broad Street
Room 700
Newark, NJ 07102

Glenn J. Moramarco (ARGUED)
Office of the United States Attorney
Camden Federal Building & Courthouse
401 Market Street
P.O. Box 2098, 4th Floor
Camden, NJ 08101
        *Counsel for Appellant*

Cathy L. Waldor (ARGUED)
Waldor & Carlesimo
2517 Highway 35
Building L, Suite 101
Manasquan, NJ 08736
        *Counsel for Appellee*

---

## OPINION OF THE COURT

---

SMITH, *Circuit Judge*.

Appellee-Defendant Keith Cimera, the former manager of a check cashing store in Montclair, New Jersey, was

2

convicted by a jury for his participation in an illegal check cashing scheme involving fourteen fraudulent checks. Several months after his conviction, Cimera moved for a new trial under Federal Rule of Criminal Procedure 33 based on "newly discovered evidence." That evidence, he claims, are deposit account numbers on the back of five of the fraudulent checks which are different from the deposit account numbers on the others, indicating that the checks were cashed in a branch of the check cashing business other than the one in which he worked. The District Court granted Cimera's motion based on its conclusion that the "discrepancy" in the account numbers constituted "newly discovered evidence."

We conclude that the District Court erred in granting Cimera's motion for a new trial. First, Cimera failed to identify any evidence that had not been admitted at trial. Second, even if he had identified new evidence which would prove that the checks were endorsed at another branch, he has failed to establish that he was subjectively unaware of such evidence or that it could not have been discovered with the exercise of reasonable diligence before the trial. Accordingly, we will reverse the order granting Cimera's motion for a new trial.

I.

Cimera was the general manager of Montclair Check Cashing in Montclair, New Jersey. He was indicted and charged with one count of conspiracy to transport stolen property

3

interstate and six counts of transporting stolen securities and money in violation of 18 U.S.C. §§ 2314 and 2312. He pled not guilty. At his trial, the Government presented evidence that Cimera had conspired with Michael Ferrante and Frank Palmer to cash checks that Palmer had stolen from his employer.[1]

Ferrante was a New Jersey bookie. He worked for Mimmo Marzullo,[2] a loanshark who ran a gambling operation in Montclair. When Ferrante's clients were unable to pay their gambling debts, Ferrante would arrange for them to obtain loans from Marzullo. Marzullo charged interest at a rate of three percent per week and made borrowers aware that, if necessary, he would use violent means to collect any outstanding debt.

---

[1] The Government entered numerous exhibits into evidence–including the fourteen fraudulent checks–and called six witnesses: (1) Larry Bastoky, the Director of Special Investigations at Ernst & Young, (2) Cimera's co-defendant, Frank Palmer, (3) Cimera's co-defendant, Michael Ferrante, (4) Nadia Ali, an assistant vice-president in the check cashing department of J.P. Morgan Chase Bank, (5) Tom Wilson, the owner of Montclair Check Cashing, and (6) Matty Dolan, Cimera's co-worker at Montclair Check Cashing. Cimera did not testify. The following factual account is drawn from the evidence presented at trial.

[2] In the record, the spelling of Marzullo's first name is unclear. He is sometimes referred to as "Nimo," and, at other times, as "Mimmo."

4

Palmer was Ferrante's former high school classmate. In the fall of 2001, Palmer was down on his luck and $3000 in debt to another bookie. Ferrante helped him obtain one of Marzullo's loans. Palmer, however, continued to gamble and became increasingly indebted to Marzullo. In order to avoid the "repercussions" of defaulting on his loans–and upon Ferrante's recommendation[3]–Palmer began stealing checks from his employer, Ernst & Young, in Lyndhurst, New Jersey. Between December of 2001 and January of 2002, Palmer stole three checks in the amounts of $1300.55, $678.56, and $690.00, respectively. Ferrante took the checks to Cimera, explained that he had a friend that worked at Ernst & Young, and told Cimera that "no one would ever find out about it." App. at 367. Cimera cashed the checks, but told Ferrante that if they were returned, Ferrante would be responsible for reimbursing him.

---

[3]  Ferrante was no stranger to the fraudulent check cashing business. In 2001, Ferrante began stealing checks from his then-employer, Nextel Communications. He cashed the checks–which totaled $8578.54–with Cimera, who told him, "If this comes back fraudulent, you're responsible for the payment." App. at 357-63. In exchange for his assistance, Ferrante gave Cimera a few hundred dollars to "ke[ep] him happy." *Id.* at 363. In November of 2001, Cimera received notice from Nadia Ali at Chase Manhattan Bank that the Nextel checks were fraudulent. He relayed that information to Ferrante, and Ferrante agreed to "make good" on the entire amount. *Id.*

5

In January of 2001, Palmer contacted Ferrante and told him that he had "something big coming up" and asked if Ferrante could arrange to have a check for more than $60,000 cashed. *Id.* at 371. Ferrante said, "Let me reach out to someone and I'll get back to you." *Id.* He then contacted Cimera. Cimera declined to discuss the matter over the phone, but invited Ferrante to his house.[4] They met later that day, and Cimera agreed to cash the check.

Until that time, Cimera and Palmer had never met. Because of the value of the check, however, the three men decided to meet the following day in the parking lot of a clothing store to discuss how Palmer had obtained the check and when Cimera would be able to deliver the money. Although there was no discussion regarding how the money would be divided, Ferrante testified that he understood that the amount would be split three ways. Ferrante delivered the check to Cimera the following day. The check was cashed on January 17, 2002. Thereafter, Palmer stole four more checks from Ernst & Young in Lyndhurst, which totaled $24,719.54. He gave these checks to Ferrante, who in turn gave them to Cimera to cash.[5]

---

[4] Ferrante testified that he had been to Cimera's house more than fifty times before this meeting.

[5] At Cimera's trial, Matty Dolan and Tom Wilson described the check cashing procedures at Montclair Check Cashing during the time when the fraudulent checks were

In April of 2002, Palmer was promoted to become the accounts payable manager in the general counsel's office of Ernst & Young's Manhattan-based headquarters. In his new position, Palmer was authorized to issue checks to outside counsel. During his first three months of employment, he falsified six checks totaling $166,212.64. Consistent with the prior scheme, Palmer gave these checks to Ferrante, who passed them on to Cimera to cash.

In June of 2002, an accounting director at Ernst & Young identified three checks that had been falsely endorsed. The suspected fraud was reported to Ernst & Young's Director of Security, Larry Bastoky. Bastoky discovered that the checks had been deposited into an account for MATT, Inc. at a Chase

---

cashed. When a new customer came to the store, he or she would fill out an informational card, which the store kept on file. When the customer handed a check to an employee, a Regiscope camera would take a photograph of the check and the customer's ID, as well as the employee cashing the check. Regiscope would store the photograph under a five-digit number and the check itself would be stamped manually, with the same five-digit number. For purposes of calculating and documenting the stores profits, the employee would then enter the date and the amount of the check on a so-called "Monroe tape."

Dolan testified that none of the fourteen fraudulent checks contained Regiscope numbers. He also explained that four of the fourteen checks could not be located on the Monroe tapes from Montclair Check Cashing.

Manhattan Bank Branch in Montclair, New Jersey. He also learned that MATT, Inc. was owned by Tom Wilson and that it served as the corporate name of two check cashing businesses: Montclair Check Cashing and West Orange Check Cashing.[6] As part of his investigation, Bastoky called Montclair Check Cashing in an effort to reach Wilson. Employee Matt Dolan answered the phone and told Bastoky that he should speak to the store manager, Keith Cimera. Although Bastoky left his name and telephone number, Cimera never returned his call. Bastoky called again and Dolan told him that he had left the message for Cimera. Finally, on July 17, 2002, Bastoky reached Cimera directly.

During their telephone conversation, Bastoky explained to Cimera that he was conducting an investigation regarding three fraudulently endorsed checks that had been cashed at Montclair Check Cashing and deposited into a MATT, Inc. account. Upon Bastoky's request, Cimera agreed to review the business records in an attempt to discover who was responsible for cashing the checks. Cimera indicated that the store received hundreds of checks every day, suggesting, according to Bastoky,

---

[6] Wilson actually owned three check cashing businesses: Montclair Check Cashing, West Orange Check Cashing, and All Checks Cashed in Parsippany. MATT, Inc. is the corporate name for the Montclair and West Orange businesses; Wilson testified that for "licensing purposes," the Parsipanny location is separately incorporated. App. at 637.

that it would be "quite a project" for him to review the records. *Id*. at 88. Bastoky faxed copies of the three stolen checks to Cimera.

Bastoky tried to reach Cimera several times after he faxed the checks to follow up. He finally reached him on July 25 or 26. Although Cimera did not indicate that he had made progress in identifying the individual who had cashed the stolen checks, he did ask if Bastoky had a suspect in mind. Bastoky indicated that he suspected Frank Palmer, and agreed to fax a photo of Palmer to Cimera. Federal agents subsequently found a copy of that fax during a search of Michael Ferrante's house.

Based on the evidence that he had collected, Bastoky decided to interview Palmer at Ernst & Young's office in Manhattan. During the interview, Bastoky told Palmer that the evidence suggested that Palmer had been stealing company checks and that he believed Palmer might have a gambling problem. Palmer denied the allegations. Bastoky placed Palmer on a paid leave of absence, retrieved his access card, identification, and keys, instructed him to contact his supervisor the following day, and had him escorted out of the building. Palmer testified that after the interview with Bastoky, he called Michael Ferrante. Ferrante instructed him to deny everything and said that he would contact Keith Cimera.

The following day, Palmer contacted his supervisor and Bastoky by telephone. He admitted that he had stolen the three

9

checks then under investigation–as well as several other checks–when he was working in the Lyndhurst office. He explained that, after he was promoted to the general counsel's office, he began creating fictitious invoices from law firms and other businesses. He would send the fictitious invoice to the Dallas accounting center, and request that a check be sent directly to his attention so that it could be hand-delivered. When Bastoky realized the breadth of Palmer's check fraud scheme, he contacted the FBI.

Several days later, Bastoky contacted Palmer, who agreed to meet him at the Meadowlands Sheraton Hotel. When Palmer arrived, several FBI agents were present. The agents offered him the opportunity to cooperate. He subsequently agreed to assist in the investigation. In all, the Government discovered that Palmer had stolen fourteen checks between January and June of 2002. Eight checks were stolen during Palmer's employment at the Lyndhurst office; six were stolen during his employment in the Manhattan office. The combined value of the checks was $261,942.38. Initially, Palmer admitted only that he had stolen twelve checks; he failed to disclose that he had stolen the two remaining checks until after he entered his guilty plea.

As part of his agreement with the Government, Palmer consented to have his conversations with Ferrante and Cimera recorded. Between August 21 and September 12, 2002, Palmer engaged in thirteen recorded conversations with Ferrante. He

10

also left two recorded messages on Cimera's answering machine. Although there is no evidence that Palmer ever actually spoke to Cimera directly, telephone records reflect that Ferrante and Cimera spoke almost every day, and often, numerous times per day, during this period.

In the recorded conversations, Palmer told Ferrante that Ernst & Young had discovered three of the fourteen stolen checks, but that they had agreed not to press charges against him if he reimbursed the company for the $4000 value of those checks. He told Ferrante that he did not have the money and asked if Cimera would pay it. Ferrante repeatedly told Palmer that he was unable to reach Cimera or that Cimera did not want to discuss the matter. Ferrante testified, however, that he spoke with Cimera "every day" and that Cimera had refused to give Palmer any money.

On October 25, 2002, the FBI searched Ferrante's house. They seized loansharking documents, gambling records, a copy of Frank Palmer's picture that Cimera received by fax from Bastoky, the Chase Manhattan bank memo from Nadia Ali, the stolen Nextel checks, two BB guns, an antique gun, and some personal checks. They also seized Ferrante's wallet, which contained a fake identification card (with Frank Palmer's information and Ferrante's picture) and a casino card in Mimmo Marzullo's name.

On July 17, 2003, a grand jury returned a 15-count

11

indictment against Marzullo, Ferrante, and Cimera. On October 7, 2003, Ferrante pled guilty to one count of illegal gambling, one count of extending credit by extortion, and one count of conspiracy to defraud the United States. At the time of trial, Ferrante had not yet been sentenced. On February 9, 2004, Marzullo pled guilty to one count of illegal gambling and one count of extending credit by extortion. He was sentenced to a 29-month term of imprisonment.

On April 1, 2004, the grand jury returned a seven-count superseding indictment against Cimera. He was tried by a jury in the District of New Jersey and was convicted on all seven counts on July 26, 2004. Following the trial, Cimera filed a Rule 29 motion for judgment of acquittal and a Rule 33 motion for a new trial. The District Court held a hearing on these motions on September 27, 2004, and entered an order denying the motions on October 8, 2004.

On January 18, 2005, Cimera filed a notice of substitution of counsel. His new attorney filed a motion for a new trial on a claim of "newly discovered" evidence on February 25, 2005. The District Court held a hearing on Cimera's second motion for a new trial on March 29, 2005.

In his motion, Cimera claimed that, after the trial, he had discovered that five of the fourteen checks bore endorsement stamps with bank deposit account numbers that differed from the numbers on the other nine checks. The discrepancy between

12

the account numbers, Cimera argued, made clear that there were two separate MATT, Inc. accounts: one for Montclair Check Cashing and one for West Orange Check Cashing. Although the checks themselves were admitted into evidence, the account numbers were illegible on four of the five checks at issue.[7]

---

[7] According to the parties, the Montclair account number was 533500135_965 and the West Orange account number was 533500135_865. In other words, the parties represent that there was only a one digit difference between the two different accounts. *See* Appellant's Br. at 19; Appellee's Br. at 14. Based on our review of the one legible "West Orange" check, App. at 1126, however–and as we pointed out at oral argument–the account number appears to be 533500245_865 and to differ by three digits.

We also note for the record that, contrary to the parties' representations that there were two different endorsement stamps used in connection with the various checks, there actually appear to be three different stamps in use:

(1)     The Montclair Stamp or, as the Government refers to it, the "965 Account." It does not have a border and reads:

PAY TO THE ORDER OF
THE CHASE MANHATTAN BANK
MONTCLAIR, NJ 07042

[DATE–DIFFERS BY CHECK]

13

021202337
FOR DEPOSIT ONLY
MATT, INC.
533500135965

*See* App. at 1118, 1119, 1120, 1121, 1122, 1123, 1124, 1125, and 1159.  The account number is legible on most, but not all, of the checks bearing the Montclair Stamp.

(2)    The Legible "West Orange" Stamp. This stamp has an external rectangular border and an internal rectangular border around the date.  It does not, however, include the corporate name, MATT, INC.  It reads:

PAY TO THE ORDER OF
THE CHASE MANHATTAN BANK
MONTCLAIR, NJ 07042

APR 30, 2002

021202337
FOR DEPOSIT ONLY
533500245<u>8</u>65

*See* App. at 1126 (emphasis added).

(3)    The Illegible "West Orange" Stamp.  Like the Legible "West Orange" Stamp, it has an internal and external

14

Cimera argued that if this information had been presented to the jury, it would have cast doubt on the Government's case and likely would have resulted in an acquittal, at least with respect to some of the counts. The District Court agreed and, in an oral ruling, granted Cimera's motion for a new trial. The Government filed this timely appeal.

## II.

The District Court exercised jurisdiction over this criminal case pursuant to 18 U.S.C. § 3231. We have jurisdiction over an appeal from an order granting a motion for a new trial pursuant to 18 U.S.C. § 3731. The decision to grant or deny a motion for a new trial under Federal Rule of Criminal Procedure 33 is committed to the sound discretion of the District Court. *Gov't of the Virgin Islands v. Lima*, 774 F.2d 1245, 1250 (3d Cir. 1985). Accordingly, on appeal, our review is for abuse of discretion. *Id.*

border, but unlike the Legible "West Orange" Stamp, it includes the corporate name MATT, INC. The account number at the bottom is not fully legible on any of the checks bearing the Illegible "West Orange" Stamp. *See* 1133, 1138, 1147, and 1164.

III.

Federal Rule of Criminal Procedure 33 provides that "[u]pon the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires." In interpreting Rule 33, this Court has held that a district court may grant a new trial on the basis of "newly discovered evidence" if five requirements are met:

> (a) the evidence must be in fact, newly discovered, i.e., discovered since the trial; (b) facts must be alleged from which the court may infer diligence on the part of the movant; (c) the evidence relied on, must not be merely cumulative or impeaching; (d) it must be material to the issues involved; and (e) it must be such, and of such nature, as that, on a new trial, the newly discovered evidence would probably produce an acquittal.

*United States v. Ianelli*, 528 F.2d 1290, 1292 (3d Cir. 1976); *see also Gov't of the Virgin Islands v. Lima*, 774 F.2d 1245, 1250 (3d Cir. 1985); *United States v. Saada*, 212 F.3d 210, 216 (3d Cir. 2000). Although the decision to grant or deny a motion for a new trial lies within the discretion of the district court, the movant has a "heavy burden" of proving each of these requirements. *See Saada*, 212 F.3d at 216.

16

In this case, the District Court reviewed each of the five requirements and concluded that they had all been satisfied. Although the Court acknowledged that the checks themselves were admitted into evidence, it nonetheless concluded that the evidence–"namely, the discrepancy in the serial numbers"–was "indeed newly discovered." *Id.* at 24. The failure to discover that discrepancy, the Court held, was not the result of a lack of diligence by any of the parties. *Id.* at 25. To the contrary, the Court explained, "it frankly was the exercise of truly extraordinary diligence by [substitute defense counsel] in coming into this case that generated what really is newly discovered evidence." *Id.* Furthermore, the Court determined that the "new" evidence was material and that it was not merely cumulative or impeaching. Finally, the Court explained:

> [The newly discovered evidence] must be of such a nature that on new trial, [it] would probably produce an acquittal. In this Court's view[,] while I am not asked to look into a crystal ball or even a magnifying glass to make that determination, what this does indicate to me is that at least if these particular counts remain drafted and charged as they are, (essentially that the checks were transmitted to and processed at Montclair Check Cashing) this evidence would, in all likelihood, produce an acquittal on such a charge as drafted.

17

Id. at 27. Based on these findings and conclusions, the Court granted Cimera's motion for a new trial. *Id.* at 29.

On appeal, the Government argues that, contrary to the District Court's holding, Cimera failed to satisfy four of the five *Ianelli* requirements. Specifically, the Government contends that: (1) Cimera failed to prove that the discrepancy between the account numbers was "newly discovered"–in other words, that it was unknown to him before the close of trial; (2) even if Cimera was unaware of the discrepancy, he could have discovered it by exercising reasonable diligence prior to the conclusion of the trial; (3) the evidence was not material to the outcome of the case; and (4) presentation of the evidence would not likely have produced an acquittal.

Insofar as the checks–including the physical markings on the backs of those checks–were admitted at trial, we conclude that Cimera has failed to identify any new evidence. Furthermore, even if Cimera had identified new evidence, we agree with the Government that Cimera failed to satisfy the first two prongs of the *Ianelli* test. Accordingly, we will reverse the District Court's order granting his motion for a new trial.[8]

_____

[8] In *United States v. Jasin*, 280 F.3d 355, 365 n.9 (3d Cir. 2002), we explained that "if a court determines as a matter of law that evidence is not newly discovered, then no matter what the court's conclusions are as to the other *Ianelli* factors, it must deny the defendant's Rule 33 motion . . . ." Because we

18

IV.

At the outset, it is important to identify the "evidence" at issue.  In this case, Cimera makes two separate, but related, arguments.  First, he claims that the digits in the *account numbers* on the checks at issue are "newly discovered" because, as a result of their size and illegibility, he was unaware of them at the time of trial and could not have identified them with the exercise of reasonable diligence.  Second, he claims that the *discrepancy between the account numbers*, which reflected that the checks had been cashed in different accounts, was "newly discovered."

The relevant physical markings–which represent the account numbers–constitute evidence.[9]  By contrast, an observation or a conclusion–or, in the words of the District Court, an "appreciation of the significance"–about those

---

conclude that the evidence at issue in this case is not "newly discovered," we do not reach the other *Ianelli* factors.

[9] "Evidence" is "[a]ny species of proof, or probative matter, legally presented at the trial of an issue [or for these purposes, capable of being presented at trial], by the act of witnesses, records, documents, concrete objects, etc., for the purpose of inducing belief in the minds of the court or jury as to their contention."  Black's Law Dictionary 656 (4th ed. 1951).

19

physical markings is not evidence.[10] The physical markings, in this case, include legible numbers, illegible marks, and blank spaces. Those markings are of such a size as to be clearly visible without the aid of a magnifying glass.[11]

---

[10] Several other circuits have held that where the defendant had possession of the evidence at the time of trial, his failure to realize its relevance will not render that evidence "newly discovered." *See, e.g., United States v. Olender*, 338 F.3d 629, 635-36 (6th Cir. 2003) (concluding that new legal theories or interpretations of the significance of evidence does not constitute "newly discovered evidence"); *United States v. Rodriguez-Marrero*, 390 F.3d 1, 29 (1st Cir. 2004) (holding that police report in defense counsel's possession was not "newly discovered"); *United States v. Jaramillo*, 42 F.3d 920, 925 (5th Cir. 1995) (holding that translation of transcript already in evidence was not "newly discovered" and explaining that "evidence is not considered 'newly discovered' where a defendant is in possession of evidence before trial but does not realize its relevance"). We agree that this is the correct rule.

[11] Though we need not address the issue in this case, we do observe that evidence discovered before or during trial may have latent attributes that are not discovered until after trial. In such a case, evidence to establish the existence of those latent attributes may be considered "newly discovered." For example, if a blood sample were admitted at trial and subsequent technological advances made it possible to identify precise DNA characteristics of that sample, the test results and/or relevant

After the trial, Cimera offered several observations and conclusions regarding the backs of the checks which he claims constitute new evidence. He observed that the digits in the account number markings are illegible on four of the five relevant checks. He also observed that the digits on the other relevant check are legible and claims that those digits are 533500135865.[12] Based on these observations, Cimera appears to conclude that: (1) the account numbers on the four illegible checks would also have read "533500135865"; (2) this account

expert testimony may be "newly discovered" evidence.

Our decision in *Ianelli* provides an apt example. In that case, the appellant presented evidence in the form of a handwriting expert's analysis that the Attorney General's initials had been forged on a document authorizing electronic surveillance. Although the document was already in evidence, the expert's conclusion regarding the forged nature of the initials–a latent attribute–was "new evidence." Because this evidence could have been discovered with the exercise of reasonable diligence, however, we held that the appellant had not satisfied the five-part test. 528 F.2d at 1293.

In this case, there are no latent attributes in the markings on the backs of the checks. In particular, based on our review, the markings are visible with the naked eye, and Cimera has presented no evidence that the use of a magnifying glass revealed any new information.

[12] Again, we note that the account number actually appears to be 533500245<u>8</u>65.

21

number is materially different than those on the remaining nine checks; and (3), on the basis of evidence not in the record, all five of these checks were endorsed at the West Orange branch. None of these observations or conclusions are evidence.

Of course, Cimera potentially could have identified new evidence that would support these observations and conclusions. For example, an associated deposit slip could have provided evidence of what the illegible numbers should have been. Likewise, the testimony of a bank employee could have established that the account number on the legible check was used exclusively for checks cashed at the West Orange branch. Because Cimera has not identified any evidence which was not admitted at trial, however, his motion should have been denied.

V.

Even if Cimera had identified evidence to prove that the checks were endorsed at the West Orange branch, he nevertheless failed to establish that such evidence would be "newly discovered" under the *Ianelli* test. The test to determine whether evidence is "newly discovered" is both objective and subjective: Evidence is not "newly discovered" if it "was [actually] known or could have been known by the diligence of the defendant or his counsel." *See United States v. Bujese*, 371 F.2d 120, 125 (3d Cir. 1967). In the words of *Ianelli*, "the evidence must be in fact, newly discovered, i.e., discovered since the trial" and "facts must be alleged from which the court

22

may infer diligence on the part of the movant." 528 F.2d at 1292.


## A.


There is nothing in the record–either in the form of affidavits or testimony–to establish that Cimera and his trial counsel were subjectively unaware of evidence which would prove that the checks had been stamped with a different account number. The burden, however, was on Cimera and his trial counsel to make this showing. *See Saada*, 212 F.3d at 216 ("[T]he movant has a 'heavy burden' in meeting these requirements.") Cimera merely argues that "[c]ommon sense dictates that had he been able to see the variance in bank account numbers, he obviously would have presented the variance to the jury as it is clearly exculpatory." *Id.* at 9. Despite this "common sense" argument, however, it is not "obvious"–at least to us–that counsel would have pointed out the discrepancy between the numbers. There may have been a variety of tactical or strategic reasons that the defendant would not want to prove definitively that the checks were cashed in a particular branch. In the absence of further proof, the District Court's conclusion that Cimera could not have been aware of the account numbers because counsel would have flagged the discrepancy for the jury is simply speculation.

B.

Moreover, even if Cimera had established that he and his trial counsel were subjectively unaware of evidence which would prove that the checks had been stamped with a different account number because of their illegibility, we nevertheless conclude that–as an objective matter–such evidence could have been discovered before the close of trial with the exercise of reasonable diligence. To determine whether the movant exercised "reasonable diligence," we must carefully consider the factual circumstances of the case. *See, e.g.,* 44 A.L.R. Fed. 13 ("[O]rdinary diligence . . . is a relative term and depends on the circumstances of the case[.]"); *see also Ianelli*, 528 F.2d at 1293 (holding that a handwriting expert's testimony that the Attorney General's initials were forged on a memorandum authorizing electronic surveillance of the defendant was not "newly discovered" evidence for Rule 33 purpose where the authorization was "warmly contested").

This case is about stolen checks. At trial, the defense advanced two theories: (1) that Cimera was not the person who cashed the checks and (2) if he did, he did not know that they were stolen. Because the identity of the individual who cashed the checks was a contested issue, the checks–and any information about where they were cashed–would be particularly important. Accordingly, we would expect a reasonably diligent attorney in a case of this type to carefully inspect the checks themselves. Here, it appears that Cimera's

24

attorney did scrutinize the checks, and more specifically, the endorsement stamps on the backs of those checks.  In fact, during his summation, Cimera's trial counsel argued that, based on the appearance of the endorsement stamps, the checks may have been cashed in a location other than the Montclair branch. Specifically, he argued:

> I want you to look at something the Government never looked at carefully.  I want you to look at the back of every single check in this case, and I want you to notice something that stands out like a sore thumb, that the deposit stamp used to deposit the checks is different on the backs of certain of the checks because those checks may have been diverted by Mr. Ferrante to some other Matt, Inc. check cashing.  So I want you to remember this.

> ...

> [T]ake every check and turn it over.  You will see several of the checks have a stamp with no square ring around it and no small square in the middle. Those checks were put into some other account of Matt, Inc.  Was it West Orange, and never Montclair?  Look at it.  I will talk to you about it later.

25

*Id.* at 925-27. Counsel also pointed out that the checks that were not on the Monroe tapes from Montclair Check Cashing seemed to be the ones that had different stamps. He said:

> Now, we find out that one, two, three, four, five–sorry–one, two, three, four, look at the deposit slips. Look at the back of the checks. It's obvious that some of these checks never went to the Montclair Matt, Inc. Maybe they went to–and this is pure speculation–but maybe they went to Matt, Inc. West Orange, which is the same corporation under the name of Tom Wilson's children because the one in Parsippany isn't Matt, Inc.

*Id.* at 961. These statements during defense summation indicate that Cimera and his counsel were in fact on notice of the potential discrepancies in the checks submitted by the Government.

In summary, we conclude that: (1) the identity of the individual who cashed the checks was a contested issue; (2) the account number was illegible on four of the five checks; (3) the account number was legible on at least one check and that number was different from the remaining nine; and (4) Cimera had notice of the facial difference in the endorsement stamps. In light of these facts, we hold that Cimera could have discovered evidence to support the conclusion that the five

26

relevant checks were cashed at the West Orange branch before or at the time of the trial through the exercise of reasonable diligence. Because Cimera offers no reason or excuse for his failure to exercise such diligence, he has not met the second prong of the *Ianelli* test.

## VI.

Pursuant to Federal Rule of Criminal Procedure 33, the District Court may grant a motion for a new trial based on the discovery of new evidence. Cimera's conclusion that there was a "discrepancy" between the account numbers on the back of the fraudulent checks is not evidence and, accordingly, is an insufficient basis upon which to grant a Rule 33 motion. Moreover, even if Cimera had identified evidence which would prove that the fraudulent checks were endorsed at another branch, he nevertheless has failed to establish that he was subjectively unaware of such evidence or that it could not have been discovered with the exercise of reasonable diligence before or at the time of the trial. Accordingly, we will reverse the order granting Cimera's motion for a new trial.