# United States Court of Appeals
## For the First Circuit

---

No. 05-2572

UNITED STATES OF AMERICA,

Appellee,

v.

CHRISTIAN MALDONADO-RIVERA,

Defendant, Appellant.

---

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF PUERTO RICO

[Hon. Jay A. García-Gregory, U.S. District Judge]

---

Before

Torruella, Circuit Judge,
Selya, Senior Circuit Judge,
and Lynch, Circuit Judge.

---

Victor González-Bothwell, Assistant Federal Public Defender, with whom Joseph C. Laws, Jr., Federal Public Defender, was on brief, for appellant.
Lynn M. Doble-Salicrup, Assistant United States Attorney, with whom Rosa Emilia Rodríquez-Vélez, United States Attorney, Nelson Pérez-Sosa, Assistant United States Attorney (Chief, Appellate Division), and Thomas F. Klumper, Assistant United States Attorney, were on brief, for appellee.

---

June 4, 2007

---

**SELYA**, **Senior Circuit Judge**.    Defendant-appellant Christian Maldonado-Rivera appeals from the denial of his motion for a new trial in this criminal case.  Concluding, as we do, that the district court did not abuse its discretion in denying the motion, we affirm the judgment below.

## I.  BACKGROUND

This case had its genesis in a surveillance of suspected drug-trafficking activity at the Los Laureles housing project in Bayamón, Puerto Rico.  The facts are uncomplicated.

On July 14, 2004, Nancy Méndez Acevedo (Méndez), a police officer with twelve years of seniority on the force, was assigned to surveil a known drug point at Los Laureles.  To reach her surveillance post, she drove an unmarked vehicle with tinted windows and parked near a basketball court.  Within a few minutes of her arrival, she noticed a yellow Nissan Xterra drive up and park on the opposite side of the basketball court.

Méndez observed an individual, later identified as the defendant, exit the Xterra with a nickel-plated pistol in his right hand.  Upon seeing the weapon, Méndez radioed for backup.  As patrol cars sped to the scene, she observed the defendant turn, throw the firearm into the Xterra, and begin to flee.  An arriving officer, Luis Lebrón Ramos (Lebrón), ran the defendant to ground in an apartment at the housing project.  In the meantime, Méndez

seized a loaded handgun and additional ammunition from within the Xterra.

In due course, a federal grand jury charged the defendant, in a single-count indictment, with being a felon in possession of a firearm and ammunition. See 18 U.S.C. §§ 922(g)(1), 924(a)(2). The defendant proclaimed his innocence. Following some procedural skirmishing (not relevant here, except for the defendant's stipulation to a prior felony conviction), the case was reached for trial before a jury on January 18, 2005.

Méndez and Lebrón, among others, testified for the prosecution about the day's events. As part of its case, the government offered testimony that the defendant's wallet and identification were found inside the Xterra. Finally, the government introduced an inventory slip for the contents of the Xterra signed by the defendant as the vehicle's owner or driver.

Because the defendant denied actual or constructive possession of the firearm, the exact location of Méndez's parked vehicle became a hotly contested issue at trial. This emphasis stemmed from a sense that the vehicle's location directly affected the clarity of Méndez's line of sight and, thus, the accuracy of her eyewitness testimony. On cross-examination, defense counsel pressed Méndez for details about where she had parked her vehicle. Presented with an inexact diagram of the scene, Méndez indicated

that she had parked in the "second parking space" from the corner.[1] Méndez also described the Xterra as being parked all the way across the basketball court and slightly to the left of where she had parked.

The defense case rested mainly on an alibi: the defendant was neither driving the car at the time in question nor toting a pistol. Several witnesses testified on the defendant's behalf. Some of them offered testimony that bore upon Méndez's account of what she had observed. One such witness was Rodolfo Bladuell, who had taken photographs of the parking lot from different angles. Several photographs taken from parking space two reflected a clear line of sight to the point at which the Xterra allegedly was parked.[2] Photographs taken from the parking spaces immediately to the right of parking space two reflected a partially obstructed line of sight.

Ana María Alicea-Aponte, who worked in the administrative offices of the Los Laureles housing project, testified that a junked green van occupied parking space two on July 14, 2004. Alicea-Aponte remembered the van because it had been situated in

---

[1]Although the parking spaces were not numbered, we refer to this location, for ease of exposition, as "parking space two."

[2]Bladuell approximated the distance between these two points at 165 feet. Méndez had estimated the same distance as being about 80 feet.

the same spot for well over a year while the administration attempted to effect its removal.

In its rebuttal case, the government recalled Méndez, who reiterated that she had stopped her car in parking space two. She also testified that vehicles were parked on either side of her car; a vehicle with flat tires was to her right, and a black vehicle was to her left.

After seven days of trial, the jury found the defendant guilty. On April 28, 2005 — approximately three months after the verdict — the defendant moved for a new trial based on newly discovered evidence. He relied upon a series of administrative reports and two photographs depicting the presence of a junked green van in or near parking space two.

The provenance of these items is relevant to this appeal. The defendant claims that, during the trial, Alicea-Aponte's supervisor at the Los Laureles administrative offices received a telephone call from an unidentified government agent. As she related it, the agent requested documentation anent an abandoned vehicle in parking space two. The supervisor later checked her files and found monthly reports (the most relevant of which spanned the ten-month period from March through December of 2004) listing the locations of abandoned vehicles at Los Laureles. She also found a photograph, apparently taken in August of 2004, depicting a junked green van in or near parking space two.

The supervisor never received a follow-up call from the agent. However, she told Alicea-Aponte, at an unspecified date, about the inquiry and about the items that she had retrieved. Alicea-Aponte then put the supervisor in touch with the defendant. The motion papers do not elaborate upon the date on which either the defendant or his counsel first learned of these events.

The new trial motion made reference to a third piece of evidence as well. That item was a photograph that the defendant claimed he had obtained from Janifer Cortés, his former girlfriend and the mother of his child. The photograph showed the defendant's infant daughter in the arms of a friend standing next to a green van in parking space two. Cortés had testified as a defense witness at the trial but had not been queried about the photograph (which purportedly was taken in October of 2004). In a sworn statement attached to the motion, she explained that the roll of film containing the picture had not been developed until after the trial had ended.

The defendant maintained that these pieces of evidence, singly and in the aggregate, would have impeached Méndez's testimony and, thus, bolstered the credibility of his alibi witnesses. The evidence was newly discovered, the defendant said, because he was not aware of it prior to or during the trial, and, in all events, he could not have predicted how Méndez's trial

testimony would evolve. Finally, he asserted that the new evidence would in all likelihood have been outcome-determinative.

The government opposed the motion. It argued that the evidence was not new in the requisite sense but, rather, easily could have been made available for use at the trial; that it was cumulative and, therefore, not material; and that it would not have resulted in an acquittal.

On August 10, 2005, the district court denied the new trial motion. The court concluded that the proffered evidence was available to the defendant prior to and during the trial and that, in the exercise of due diligence, he could (and should) have discovered it. The court noted specifically that, given Alicea-Aponte's trial testimony, the defendant had every incentive to seek verification of the green van's location. With respect to the Cortés photograph, the court explained that the defendant had not advanced any satisfactory reason as to why the photograph was not available prior to or during the trial.

The court added that even if the various pieces of evidence cited in the motion could be regarded as newly discovered, they served only to impeach Méndez's testimony as to her exact position when she saw the defendant and to corroborate Alicea-Aponte's testimony about the presence of the junked green van. Given the undisputed evidence that a nickel-plated pistol was retrieved from the Xterra and that the defendant had signed an

-7-

inventory of the Xterra's contents as that vehicle's driver or owner, the court concluded that the "new" evidence was not sufficiently material to guilt or innocence to justify a new trial. See United States v. Maldonado-Rivera, No. 04-390, slip op. at 8 (D.P.R. Aug. 10, 2005) (unpublished) (concluding that "[r]egardless of whether agent Méndez saw the defendant from the first, second, or third parking space, the evidence in this case proves beyond [a] reasonable doubt that she indeed could see the defendant from where she was parked").

Following the denial of the new trial motion, the district court sentenced the defendant to serve a 48-month incarcerative term. This timely appeal ensued.

## II. ANALYSIS

Federal Rule of Criminal Procedure 33 provides that a district court, upon motion of the defendant, may "grant a new trial if the interest of justice so requires." To the extent that such a motion is grounded upon newly discovered evidence, it may be filed at any time within three years of the verdict. See id. The defendant's new trial motion was, therefore, timely. The district court nonetheless denied it.

On appeal, the defendant argues that the district court applied the wrong legal standard and that, in any event, it improvidently denied the motion. We address these assignments of error sequentially.

-8-

The two assigned errors call to mind different review modalities. The choice of a legal standard presents an abstract question of law and, thus, triggers de novo review. See United States v. Huddleston, 194 F.3d 214, 218 (1st Cir. 1999). So long as the district court applies the right legal standard, however, its decision about whether to grant or deny the motion is a judgment call. Consequently, that decision engenders review for abuse of discretion. See United States v. Natanel, 938 F.2d 302, 313 (1st Cir. 1991).

## A. **The Legal Standard**.

Typically, a motion for a new trial bottomed on newly discovered evidence requires a criminal defendant to make a four-part showing. See United States v. Rodriguez-Marrero, 390 F.3d 1, 14, 28 (1st Cir. 2004); United States v. Alicea, 205 F.3d 480, 487 (1st Cir. 2000); United States v. Wright, 625 F.2d 1017, 1019 (1st Cir. 1980). That showing entails a demonstration that (i) the evidence upon which the defendant relies was unknown or unavailable to him at the time of trial; (ii) the failure to bring the evidence forward at trial was not occasioned by a lack of diligence on the defendant's part; (iii) the evidence is material (as opposed to being merely cumulative or impeaching); and (iv) the evidence is such that its introduction would probably result in an acquittal

upon a retrial of the case.[3]  See Wright, 625 F.2d at 1019.  Under this conventional approach (which we shall call the "Wright standard"), the first and second requirements go hand in hand, as do the third and fourth requirements.  But whatever groupings may be made for ease in analysis, each of the four requirements must be satisfied in order for the defendant to gain a new trial.  See, e.g., Rodriguez-Marrero, 390 F.3d at 14; Huddleston, 194 F.3d at 218.

The Wright standard applies to most, but not all, new trial motions premised on newly discovered evidence.  We say "most" because a modified standard applies when a defendant grounds his motion on newly discovered evidence that was unknown or unavailable due to the government's failure to disclose evidence favorable to the accused and material to his defense.  See Brady v. Maryland, 373 U.S. 83, 87 (1963); United States v. González-González, 258 F.3d 16, 20 (1st Cir. 2001).

If the basis for a new trial motion is a Brady violation — that is, a failure on the government's part to disclose Brady information — the law requires, on the third and fourth prongs of the new trial test, only that the defendant show a reasonable probability that, had the evidence been disclosed in time to permit its use at the trial, the result of the proceeding would have been

_____

[3]This means an "actual probability that an acquittal would have resulted if the evidence had been available."  United States v. Sepulveda, 15 F.3d 1216, 1220 (1st Cir. 1993).

-10-

different. Kyles v. Whitley, 514 U.S. 419, 433-34 (1995); González-González, 258 F.3d at 20. That, in turn, requires an analysis of whether the trial, in the absence of the undisclosed evidence, resulted in a verdict "worthy of confidence." González-González, 258 F.3d at 20 (quoting Kyles, 514 U.S. at 434); see Rodriguez-Marrero, 390 F.3d at 28.

Because the standard applied to new trial motions based on Brady violations — what we shall call the "modified standard" or the "Brady error rule" — is less onerous and, thus, easier for defendants to satisfy, see González-González, 258 F.3d at 20, defendants have an incentive to "try to shoehorn as much of the new evidence into the Brady category as possible," United States v. Josleyn, 206 F.3d 144, 152 (1st Cir. 2000). This case is no exception: the defendant suggests that a Brady violation occurred because the government "found" and failed to inform the defense about the newly discovered evidence. Building on that foundation, he posits that the district court should have employed the modified standard in evaluating his new trial motion.

The government rejoins on two fronts. First, it asserts that the defendant waived any Brady-based argument. Second, it debunks the suggestion that a Brady violation occurred. Its bottom line is that the district court used the appropriate legal standard.

We agree with the government that the defendant failed to raise any Brady-based claim before the district court. To the contrary, in pressing his new trial motion, the defendant cited United States v. Montilla-Rivera, 115 F.3d 1060, 1064-65 (1st Cir. 1997) — a Wright standard case — and framed his argument for a new trial in terms of the Wright standard. There is no reference either in Montilla-Rivera or in the defendant's district court memorandum to the special gloss that would be brought into play by the existence of a Brady violation.

The thrust of the defendant's argument before the district court confirms his eschewal of the Brady error rule. He made no contention below that the government either had transgressed Brady or had failed to turn over Brady material. Brady itself was conspicuously absent from the list of authorities cited in the memorandum that the defendant submitted in the district court.

This series of omissions precludes the "wrong legal standard" arguments that the defendant seeks to advance in this venue. After all, "[i]t is a bedrock rule that when a party has not presented an argument to the district court, she may not unveil it in the court of appeals." United States v. Slade, 980 F.2d 27, 30 (1st Cir. 1992).

We need not belabor this point because a more substantive infirmity dogs the defendant's claim. The record contains no

evidence that, at any time prior to or during the trial, the government was aware of any of the three pieces of proof mentioned in the motion. This gap in the record is itself dispositive of the claim that a Brady violation occurred. For Brady to operate, the government not only must know about undisclosed evidence but also must have custody or control of that evidence. See Lavallee v. Coplan, 374 F.3d 41, 44 (1st Cir. 2004); United States v. Bender, 304 F.3d 161, 163 (1st Cir. 2002).

Here, the new evidence was, for aught that appears from the record, unknown to the government until the defendant filed his post-trial motion. By the defendant's own account, the agent who supposedly placed the call to Alicea-Aponte's supervisor never followed up. There is nothing to suggest that the evidence was in any way in the government's possession or under its control. Accordingly, the government had no opportunity, much less a duty, to disclose it.

The absence of such a showing is an insuperable obstacle here. The fact that the government allegedly made an effort to ascertain whether some of the evidence existed will not suffice to trigger a duty to disclose. Nor does the fact that the government, through a more vigorous investigation, might have been able to discover the evidence. See Bender, 304 F.3d at 164 (holding that Brady doctrine does not "require[] a prosecutor to seek out and

disclose exculpatory or impeaching material not in the government's possession").

Before us, the defendant essays a related claim: that the Brady error rule applies because the government was guilty of the knowing use of perjured testimony (by which he means Méndez's testimony). Legally, this claim has its roots in a line of Supreme Court decisions holding that a conviction obtained through the prosecution's knowing use of perjured testimony cannot stand. See, e.g., Napue v. Illinois, 360 U.S. 264, 269 (1959); Mooney v. Holohan, 294 U.S. 103, 112 (1935). This case law is potentially significant to the standard applicable to the adjudication of the defendant's new trial motion because we have held that "the Brady error rule should apply to claims of knowing use of perjured testimony." González-González, 258 F.3d at 21.[4] Here, however, the asserted claim cannot withstand even the most cursory scrutiny.

In his memorandum in support of his new trial motion, filed in the district court, the defendant explicitly disclaimed any argument that the prosecution had knowingly used false evidence. See Defendant's Memo. at 4 ("Napue involves the knowing use by the prosecution of false evidence. That is not being alleged here, nor does defendant have any proof or indication of

---

[4]In González-González, 258 F.3d at 22, we noted that, under Supreme Court precedent, there is a linguistic difference in the formulation of the legal rules applicable to each context. We nonetheless adjudged these sets of rules "equivalent." Id.

-14-

the same."). In other words, the defendant flatly conceded that he was not alleging the knowing use of false or perjured testimony by the prosecution. A party who stakes out a position before the district court cannot reverse his field and take an inconsistent position on appeal simply because he perceives that doing so might work to his advantage. See, e.g., United States v. Joost, 133 F.3d 125, 128 (1st Cir. 1998); United States v. Coady, 809 F.2d 119, 121 (1st Cir. 1987).

To say more on this point would be supererogatory. For the reasons discussed above, we reject the defendant's importuning that the district court should have used the Brady error rule, rather than the Wright standard, in adjudicating his new trial motion.

## B. **The District Court's Decision**.

Having determined that the lower court applied the proper legal yardstick to the new trial motion, we next consider whether the court's denial of the motion constituted an abuse of discretion.

The district court rejected the motion on the basis that the proffered evidence met none of the four requirements of the Wright standard. In the circumstances of this case, the first two requirements are dispositive of the appeal. These requirements concern whether the evidence was unknown or unavailable to the defendant at the time of trial and if so, whether that situation

-15-

was attributable to a lack of due diligence on his part.  See Alicea, 205 F.3d at 487; Wright, 625 F.2d at 1019.

We start with the materials retrieved by Alicea-Aponte's supervisor: the monthly "abandoned vehicle" reports and the photograph of the junked green van.  There is no dispute that this evidence was in existence at the time of the trial.  The defendant nonetheless asserts that he was unaware of it until after the verdict.[5]  His explanation is that the issue of Méndez's exact location arose only when she testified at trial, and that the pace of the trial hampered his ability to take stock of evidentiary leads.  This explanation rings hollow.

While the defendant may not have known Méndez's precise vantage point prior to trial, he had every reason to believe that her line of sight was of the utmost importance.  That the defendant appreciated the salience of this datum before and during the trial can be gleaned from two incontrovertible facts.  First, during the trial, the defendant had his investigator (Bladuell) take photographs of the parking area from different angles.  The commissioning of these photographs is a clear indication that the

_____

[5]The motion papers are silent as to when the defendant actually learned of this evidence.  That fact alone runs up a red flag because it leaves open the possibility that the defense was contacted by Alicea-Aponte or her supervisor during the trial.  Cf. Alicea, 205 F.3d at 487 (finding unpersuasive claim of newly discovered evidence where "appellant's motion papers said nothing about when or how he had learned of [it]").

defense appreciated the potential import of Méndez's line of sight and had sufficient time to react to her testimony.[6]

The second fact emerges from the trial transcript. The defendant could not help but know that Méndez would be the key witness against him. Defense counsel, armed with previously gathered maps and diagrams of the parking area, pressed her on cross-examination for details about her exact location. When the government's case in chief concluded, the defense proceeded to mount a direct challenge to the clarity of Méndez's line of sight by, inter alia, eliciting testimony from Alicea-Aponte about a junked green van in parking space two. In the course of this exegesis, Alicea-Aponte mentioned the housing project's "regulations" governing abandoned vehicles, the "steps" taken by her office to urge noncompliant residents to change their ways, and the regulatory requirement that the owner of an abandoned vehicle "authorize" any action that might be taken by the administration to remove it from the premises.

Given this body of knowledge, we think it readily evident that a reasonably prudent person would have considered the possibility that records existed at the administrative offices of Los Laureles that might bear on the critical line-of-sight issue (and, specifically, on the question of whether the junked green van

---

[6]In this regard, it bears mentioning that the defendant did not seek a continuance after Méndez completed her direct examination.

-17-

was in fact occupying parking space two on July 14). The defendant, however, did not make any inquiry into either the existence or the contents of any such records.

In the Rule 33 milieu, due diligence is a context-specific concept. See United States v. Cimera, 459 F.3d 452, 461 (3d Cir. 2006); United States v. Hernández-Rodríguez, 443 F.3d 138, 144 (1st Cir. 2006). As a general proposition, however, the movant must exercise a degree of diligence commensurate with that which a reasonably prudent person would exercise in the conduct of important affairs. See, e.g., Cimera, 459 F.3d at 461-62; United States v. LaVallee, 439 F.3d 670, 701 (10th Cir. 2006). Where, as here, the newly proffered evidence all pertains to a matter that the defendant knew would be in issue at his trial, and the source of that evidence was an obvious one, the district court had every right to deem the requirement of due diligence unsatisfied. See, e.g., United States v. Canova, 412 F.3d 331, 349 (2d Cir. 2005).

The short of it is that the defendant had ample time and reason to investigate the situation that existed in the parking area. He undertook some investigation into this situation but did not investigate it fully. He cannot now be allowed to interpose his disregard of the obvious as an excuse for his failure to learn about easily ascertainable evidence. Cf. Paterson-Leitch Co. v. Mass. Mun. Wholesale Elec. Co., 840 F.2d 985, 989-90 (1st Cir.

1988) ("Courts, like the Deity, are most frequently moved to help those who help themselves.").

Under these circumstances, we discern no abuse of discretion in the district court's conclusion that the materials in the Los Laureles files were available to the defendant at the time of trial and that, in the exercise of ordinary diligence, he would (and should) have discovered them. Accordingly, that evidence cannot justify a new trial. See United States v. Falu-Gonzalez, 205 F.3d 436, 443 (1st Cir. 2000) (explaining that evidence that could have been discovered in the exercise of due diligence cannot comprise newly discovered evidence within the purview of Rule 33); see also Wright, 625 F.2d at 1019 (discussing district court's "broad power" to evaluate the circumstances when considering a new trial motion based on newly discovered evidence).

This leaves the third piece of "new" evidence: the Cortés photograph. The district court found that the defendant had not met his obligation of showing why this photograph — which was taken before the trial began but not developed until after the trial ended — could not have been discovered and made available in time for use at the trial. This finding is supportable given that Cortés was called as a witness for the defense, was close to the defendant, and had every reason to cooperate with him. See Rodriguez-Marrero, 390 F.3d at 30.

We refrain from any detailed analysis in this regard because it is crystal clear, as the district court also ruled, that this piece of evidence did not satisfy the third prong of the Wright standard: materiality. The photograph served, at most, only to impeach Méndez's description of her vantage point.

Evidence that is cumulative or of marginal relevance ordinarily is insufficient to satisfy the third requirement of the Wright standard. See, e.g., United States v. Gwathney, 465 F.3d 1133, 1144-45 (10th Cir. 2006); Natanel, 938 F.2d at 314. So too evidence that is merely impeaching. See, e.g., United States v. Colón-Muñoz, 318 F.3d 348, 361 (1st Cir. 2003) (explaining that "newly discovered evidence which is merely impeaching normally cannot form the basis for a new trial" (citations and internal quotation marks omitted)). The Cortés photograph, which was taken over two months after Méndez made her observations, does no more than weakly supplement the steady stream of defense efforts to erode Méndez's credibility. If Alicea-Aponte's testimony, Bladuell's testimony, Bladuell's photographs, and the maps and diagrams did not sully Méndez's credibility in the jurors' eyes, it is surpassingly difficult to believe that the Cortés photograph would have made the slightest difference.[7]

---

[7]The defendant strives to persuade us that the Cortés photograph strikes at the heart of Méndez's veracity. He reasons that if the junked green van was in fact parked both in parking space two and to Méndez's right, there would have been no room for the black car that Méndez recalled being parked to her left. We

-20-

## III.  CONCLUSION

We need go no further.  For the reasons elucidated above, we conclude, without serious question, that the district court neither applied an incorrect legal standard nor abused its discretion in denying the defendant's motion for a new trial.

**Affirmed**.

---

are not convinced.  Fairly viewed, the Cortés photograph — even if the scene that it depicts existed on July 14 (more than two months earlier) — does not preclude the presence of another vehicle being parked, if haphazardly, to her left.